AMY MOSER N/K/A AMY REYNOLDS, Appellant, *v.* TIM MOSER, Respondent.

No. 22726

August 6, 1992                                         836 P.2d 63

[Rehearing denied November 3, 1992]

*Dickerson, Dickerson, Lieberman & Consul,* Las Vegas, for Appellant.

*John C. Wawerna,* Las Vegas, for Respondent.

## OPINION

By the Court, ROSE, J.:

Amy Antonucci Moser (Amy) and Tim Moser (Tim) were married in Las Vegas, Nevada, on September 15, 1985, and were divorced on September 21, 1987. Their only child, Elizabeth Katherine Moser (Katie) was approximately eighteen months old at the time of the parties' divorce. Initially, both parties agreed that Amy should have primary physical custody of Katie.

After divorcing Tim, Amy married Gregory Scott Reynolds (Greg) and became Amy Reynolds. Amy, Greg, and Katie continued to live in Las Vegas until the summer of 1990, when the family moved to Detroit, Michigan, because of Greg's employment. Fourteen-year-old Richard Reynolds (Richard), one of Greg's children from his previous marriage, also resided with the family in Michigan. Around the time of the move, Tim executed an agreement that permitted Amy to relocate with Katie to Michigan.

Pursuant to Tim and Amy's relocation agreement, Tim was permitted to pick Katie up in Michigan and take her to Las Vegas for two weeks in December of 1990. Tim failed to return Katie to her mother in Michigan at the end of this two-week period. Consequently, Amy went to Las Vegas to retrieve the child. Because Tim refused to relinquish custody of Katie, Amy filed a motion in the district court to compel her return. At a hearing before a court appointed domestic relations referee, Tim alleged for the first time that the reason he had refused to return Katie to Amy was that Katie had been behaving in a manner that suggested that she had been sexually abused.

In support of his allegation of sexual abuse, Tim submitted numerous affidavits from his friends and family to the referee. In his own affidavit, Tim stated that he, his live-in girlfriend, Brenda Gardner (Brenda), his baby sitter, Tiffany Krisciliojlu (Tiffany), and his sister, Sheri Brown (Sheri), all observed that Katie needed to urinate every fifteen to twenty minutes during the day and evening, and that she would freely and openly undress in front of them and digitally fondle her vaginal area. Tim further alleged that Katie had told him that she showered with both Greg and Richard, and that they would have her wash their "prickers" or "buff their helmets." Tim also stated that Katie said she knew a man who had been murdered, that she described in detail the dead body and blood, and that she complained of a monster who scratched her.

Tim also took Katie to see Dr. Joan Owens (Owens), a licensed family counselor. Owens' affidavit stated that her observations of Katie and the statements that Katie made during their counseling sessions indicated that she may have been sexually molested. However, Owens also admitted that most of the information contained in her initial affidavit was based upon statements made to her by Tim and Brenda.

Tim further alleged that Katie was developmentally disabled. Several of his friends and family members stated in their affidavits that Katie was an uncontrollable and obnoxious child when she first arrived in Las Vegas. In addition, Tim submitted a progress report from the preschool in which he had enrolled Katie. This report stated that Katie initially would not follow directions. However, the report also stated that by the end of Katie's first week of preschool, she was behaving better; by the end of her second week, she was progressing academically; and by the end of her third week, she was doing very well.

Amy also submitted an affidavit, stating that Katie was never obnoxious or hyperactive in her presence. She further stated that she had never observed a tendency on Katie's part to urinate frequently, and that Katie had never mentioned having seen a man

murdered or being scratched by monsters. In addition, Amy testified that although she had heard her stepson, Richard, use the phrase "beat my meat," the only individual she had ever heard use the expression "buff my helmet" was Tim, who used it frequently. Amy contended that the allegations that Katie showered with Greg and Richard were false, because Katie was in Amy's physical presence substantially all of the time she resided in Michigan, and because the house in Michigan was in the process of being remodeled at that time and did not have a functional shower. She also stated that she had enrolled Katie in preschool in November of 1990, and that her progress reports did not mention any unusual behavior.

Beginning on February 5, 1991, a series of hearings were held before a domestic relations referee. Because the referee could not ascertain the merit of Tim's allegations of sexual abuse, he referred the parties to marathon conflict resolution through the district court's Child Custody Division. The referee also determined that it would be beneficial for the court to appoint its own independent expert to evaluate and counsel the child, and he appointed Dr. Elizabeth Richitt (Richitt), a licensed psychologist, for that purpose.

On May 23, 1991, after Richitt had had an opportunity to evaluate Katie, the referee again considered the evidence presented, which included deposition transcripts of Richitt, Tim, Sheri, Brenda, and Tim's mother, Virginia McBride. In addition, the referee discussed this case at length with Richitt and with Bill Sheldon of the Child Custody Division. The referee did not, however, consider Owens' reports. The referee concluded that: (1) Katie had experienced trauma, which was at least partially caused by separation anxiety, (2) there was nothing to suggest that Amy or Amy's lifestyle in Michigan were the cause of Katie's behavioral problems, (3) Amy's household was not inappropriate, (4) the allegations of sexual abuse had not been shown, and (5) there had not been a change of circumstances. Therefore, the referee ordered that Amy should retain custody of Katie and that they should be permitted to return to Michigan. The referee also stipulated that Katie should be enrolled in preschool to further her social development, and that she should be evaluated by a clinical psychologist in Michigan shortly after her return to that state.

Tim filed an objection to the referee's report within ten days, alleging that the referee erred in considering the evaluation of Richitt rather than Owens, with whom Katie had reportedly "bonded." No other specific objections to the referee's findings of fact were raised. Because of Tim's objections, the district judge decided to reconsider the matter without conducting an

evidentiary hearing but requiring Richitt and Owens to meet with Katie one more time and to each submit an additional evaluation.

Having read the additional reports of the counselors' and reviewed the affidavits in the record, the district court found that there had been a drastic change in the situation of both parents since their divorce in 1987. However, the judge failed to indicate the nature of this change. He also concluded that it would be in Katie's best interest to be placed with Tim, based upon the statement in Richitt's report that "a return to Michigan may reactivate Katie's anxiety," and the statement in Owens' report that "Katie is a fragile child." Thus, the district judge reversed the referee's decision and awarded primary physical custody of Katie to Tim. In addition, although permitting the parties to share joint custody of Katie, the district judge limited Amy's visitation rights to visitations occurring in the State of Nevada.

The principal issue in this matter is what standard of review the district court must observe in deciding to reject the findings and recommendations of the domestic relations referee. NRS 125.005, which was enacted in 1985, makes court appointed domestic relations referees the masters of the facts in custody cases, subject to certain limitations. These referees are authorized to hear all disputed factual issues and make written findings of fact and recommendations to the district judge. NRS 125.005(2). However, NRS 125.005(4) provides in part:

> Within 10 days after receipt of the [referee's] report, either party may file and serve upon the other party written objections to the report. If no objection is filed, the court shall accept the findings of fact unless clearly erroneous, and judgment may be entered thereon. If an objection is filed within the 10-day period, the court shall review the matter and enter such order, judgment or decree as is just, equitable and appropriate.

From the plain language of NRS 125.005(4), it appears that the district court is not required to follow findings of fact made by the referee that are specifically objected to by a party. What remains unclear from the language of the statute is whether, when a timely objection is filed, the district court has the discretion to ignore all factual findings not related to the specifics of the party's objection. Furthermore, if the district court has discretion to ignore the factual findings of the referee, this court must determine how much evidence the district court should be required to consider in arriving at a de novo factual conclusion.

Litigants in a custody battle have the right to a full and fair hearing concerning the ultimate disposition of a child. Mathews v. District Court, 91 Nev. 96, 97, 531 P.2d 852, 852 (1975). At a

minimum, observance of this right requires that before a parent loses custody of a child, the elements that serve as a precondition to a change of custody award must be supported by factual evidence. Furthermore, the party threatened with the loss of parental rights must be given the opportunity to disprove the evidence presented.

The district court's finding in the instant case that a change of circumstances had occurred, a necessary precondition to a change of custody award under Murphy v. Murphy, 84 Nev. 710, 711, 447 P.2d 664, 665 (1968), was not supported by any statement indicating what that change of circumstances was found to have been. In addition, the district court did not specifically refute the findings of the referee that the allegations of sexual abuse had not been shown and that there was nothing to suggest that Amy, or her lifestyle in Michigan, was the cause of Katie's behavioral problems. Although Owens' report was the only distinctly new information considered by the district court, Amy's request to take Owens' deposition, made prior to the date Owens and Richitt submitted their final reports, was denied. Amy should have been permitted the opportunity to cross-examine Owens. Thus, we hold that the district court's method of reviewing the referee's findings in this case denied Amy her right to a full and fair hearing concerning the custody of her child.

By this holding, we do not mean to invalidate the system by which recommendations of the referee are reviewed by the district court. However, where the referee is the decision maker closest to the facts and he or she makes explicit findings of fact, we conclude that it is error for the district court to wholly reject the referee's findings without conducting a proper evidentiary hearing concerning the fact or facts in issue. Where, on the other hand, the district court reviews the case file and finds nothing troublesome in the referee's factual findings, an evidentiary hearing should not be necessary.

In the present case, because the district judge did not explain his findings that the circumstances of the parties had drastically changed, and because this court has found nothing in the record or in the referee's findings that supports the conclusion that a change of circumstances had occurred, we conclude that Tim has failed to meet his burden of proof. Therefore, we reverse the order of the district court and order that Katie be returned forthwith to her mother in Michigan, pursuant to the referee's recommendations.

STEFFEN and YOUNG, JJ., concur.

SPRINGER, J., with whom MOWBRAY, C. J., joins, concurring and dissenting:

I concur in the judgment reversing the district court's order but would remand this case for a new trial.

Because our newly created family court will obviate the kinds of problems created in this case by the domestic referee system in the Eighth Judicial District, I will not belabor the matter in this dissent.

Due process of law and common fairness require that the one who hears a case should also decide it. Due process implies the right or persons affected by a decision to be present before the tribunal which pronounces judgment. Here, the judge who decided the case did not hear it. I would therefore send the case back to the district court for a trial.

NRS 125.010 requires, in cases like this, that the district judge "review the matter and enter such order, judgment or decree as is just, equitable and appropriate." I think that the only proper means of review in a case such as this is for it to be heard by a district judge with the power to decide the custody issue. As stated in the majority, "[l]itigants in a custody battle have the right to a full and fair hearing concerning the ultimate disposition of a child." My reading of the record tells me that neither party has been given a full and fair hearing in this case. Although I would also reverse, I would remand for a full and fair hearing before a district judge; therefore, I dissent.