GALE LAWRENCE PEARSON, Appellant, *v.* THOMAS M. PEARSON, Respondent.

No. 23635

March 30, 1994                    871 P.2d 343

[Rehearing denied June 10, 1994]

*Richard W. Young,* Reno, for Appellant.

*Ronald J. Logar,* Reno, for Respondent.

## OPINION

By the Court, STEFFEN, J.:

Appellant, Gale Lawrence Pearson ("Lawrence"), filed a complaint for divorce against respondent Thomas M. Pearson ("Pearson"). In an atmosphere of hostility between the parties, the district court issued a divorce decree and a temporary order of custody requiring both parties to submit reports regarding permanent custody. A psychological report was also received by the district court. Based upon preceding court hearings, the reports and filings of both parties and the psychological report, the district court awarded permanent physical custody to Pearson. Lawrence appeals, claiming no notice or opportunity to be heard and improper ex parte communication between the judge and the psychologist. For reasons unrelated to the rulings of the district court judge, we reverse and remand this matter to the Washoe County Family Court for a custody hearing.

### STATEMENT OF FACTS

Lawrence and Pearson were united in marriage in 1977 and later two children blessed their union. However, in 1988, while Lawrence was in medical school at the University of Nevada, Reno, the marriage soured and divorce proceedings were initiated. The desire of each parent to obtain primary physical custody of the children has been hotly disputed and forms the basis for this appeal. On August 14, 1990, after nearly two years of discordant hearings and interactions between the parties (and to an extent counsel), the district court issued its findings of fact, conclusions of law, judgment and decree of divorce. The district court indicated that the custody provisions, as set forth in the decree, were temporary and that custody would be reevaluated one year later. In addition, the district court ordered both parties to submit a report to the court pointing out specific efforts made

during the preceding year to facilitate a better environment for the children.

In accordance with the divorce decree, both parties filed their respective reports with the district court in May of 1991. Several months later, each party filed a "Request for Submission of Motion." Under the rules of court pursuant to which the form notice was provided, the form request was used to inform the court that the matter was being submitted for decision by the court. *See* Second District Court Rule 12.

In March of 1992, at the direction of the district court, Dr. Robert McQueen began evaluations of Pearson, Claudia (Pearson's new wife), the Pearson children and Claudia's daughter. Lawrence received a letter from Dr. McQueen dated March 30, 1992, inviting her to meet with him at her convenience, mornings, afternoons, evenings or weekends, and advised her that he would be submitting his report to Judge Whitehead during the first half of May. Lawrence failed to respond to Dr. McQueen's invitation. Nearly two months later, Lawrence's attorney, Richard Young, sent a letter to Dr. McQueen dated May 26, 1992, advising him that Lawrence would be "quite willing to interview with you [Dr. McQueen] to assist in any way possible." However, by that time, the report had already been submitted to the district court. Remarkably, no further action was taken by Young until the district court issued the order from which this appeal is taken.

The purpose of Dr. McQueen's evaluation was to assist the court in reaching a custody determination. *See* NRS 125.490(3). The record indicates that Dr. McQueen retained the assistance of Dr. Helen L. Krell, Associate Clinical Professor of Psychiatry, University of California Davis Medical School, who had previously evaluated and provided treatment for the elder Pearson child. A letter from Dr. McQueen to Lawrence's attorney indicates that this report was completed and delivered to Judge Whitehead "a day or two before May 15th, 1992."

On July 23, 1992, the district court filed its order which modified the temporary custody order of August 14, 1990, and provided that Pearson would have primary physical custody. The July 23rd order provoked this appeal by Lawrence. She alleges that the district court's failure to provide notice and a hearing prior to determining the issue of primary custody violated her constitutional due process rights. Additionally, Lawrence contends that the district court's reliance on the reports, which were not provided to the parties, inappropriately prevented her from testing their validity by cross-examining the individuals who prepared them. Finally, she alleges that because Judge Whitehead reviewed a "phantom and/or fugitive report" that he in some way

placed himself in a position of bias that requires his disqualification in the event this court decides to remand the matter for further proceedings.

## DISCUSSION

Lawrence contends that her due process rights were ignored because she did not receive notice, a hearing or the right to be heard prior to the court's determination of custody. We conclude that this assertion is at best disingenuous.

The record makes it abundantly clear that as early as August 31, 1989, Judge Whitehead was contemplating the appointment of an independent expert to assist him in reaching a custody determination.[1] (See Appendix A.) It is equally clear, contrary to attorney Young's representations at oral argument, that both parties were fully aware of the fact that the court would invite an independent psychological evaluation which would be submitted directly to the court. Moreover, as indicated above, in March of 1992, Dr. McQueen sent Lawrence a letter informing her of the evaluations and inviting her to participate at any time convenient to her schedule.

Presumably advised by Lawrence that a report was to be submitted to Judge Whitehead in the first half of May, Young did not respond to the doctor until May 26, 1992. Dr. McQueen answered Young's letter from his Colorado vacation spot indicating, in part:

> When I received no response from [Lawrence] to my letter I frankly felt it would be presumptuous of me to press her further and I did not do so. I did, however, continue the schedule of meetings I had outlined in my letter to her and *a report of those interviews was delivered to Judge Whitehead's chambers a day or two before May 15th, 1992* (emphasis added).

It is thus clear that Lawrence and her counsel did in fact know that psychological evaluations had been taking place and that a report had been delivered to Judge Whitehead. If Lawrence was as surprised and outraged over the submission of Dr. McQueen's report as her counsel indicated at oral argument, she should understand that Young did nothing to express his or his client's concern to the district court judge regarding the submission of the

---

[1]The actions of the district court are sanctioned by NRS 125.490(3), which provides:

> 3. For assistance in making a determination whether an award of joint custody is appropriate, the court may direct that an investigation be conducted.

report. Furthermore, Young admitted that no contact was made with the district court to ascertain the whereabouts or the contents of the psychological report, nor did he request a copy of the report or a hearing to discuss the substance of the report.

We are troubled by the combination of Young's inaction and his unsupported, strident and reckless comments against the district court judge expressed in his appellate briefs and at oral argument. As an attorney with extensive experience in family law, Young must know the procedures necessary to protect his client's rights. It ill behooves counsel to attempt to shift the blame for his own derelictions on to the trial judge whose diligence and fairness in this matter is amply attested to in the record. The record clearly reveals that if indeed there were any deficiencies in the proceedings below, they were clearly invited by Young's acts of commission and omission.

> The doctrine of "invited error" embodies the principle that a party will not be heard to complain on appeal of errors which he himself induced or provoked the court or the opposite party to commit. It has been held that for the doctrine of invited error to apply it is sufficient that the party who on appeal complains of the error has contributed to it. In most cases application of the doctrine has been based on affirmative conduct inducing the action complained of, but occasionally a failure to act has been referred to.

5 Am.Jur.2d *Appeal and Error* § 713 (1962), pp. 159-60. *See* People v. Marshall, 790 P.2d 676, 687 (Cal. 1990), *cert. denied,* 1110 (1991); Pettingill v. Perkins, 272 P.2d 185, 186 (Utah 1954). Furthermore:

> The rule that error induced or invited by the appellant is not a proper subject of review on appeal has been applied, in both civil and criminal cases, to a large variety of trial errors, including claimed misconduct of the judge, or alleged error having to do with the jury.

5 Am.Jur.2d *Appeal and Error* § 721 (1962), p. 165. Since Young, on behalf of his client, filed the form requesting submission of the matter to the court for decision, Lawrence may not be heard to complain of the decision which resulted from her own attorney's request. Nevertheless, and despite Young's failure to provide a basis for relief for his client on appeal, we have elected to remand this action for other reasons.

At the outset of his argument on appeal, Young launched an unseemly attack on the trial judge and attempted to bury his own

derelictions in the din. Young thus attempted to portray the trial judge as having engaged in a "secret" maneuver to deprive Lawrence of her right to due process in the contest for custody of the children. The record is utterly devoid of support for Young's effusive and irresponsible comments. We are nevertheless left with an attorney's public representation that his client, the mother of the children whose interests are paramount to this court, as they obviously were to Judge Whitehead, did not have an opportunity to personally urge her position on the subject of custody in the district court. It is clear from the record that Judge Whitehead never denied Lawrence a hearing and there is no reason to assume that the judge would have refused Lawrence a hearing if her attorney had been motivated to ask for one rather than do nothing other than stand on the form previously filed requesting that the matter be submitted for decision. Nevertheless, given the seriousness of issues of custody of children and the fact that Lawrence did not previously take advantage of seeking a hearing prior to the court's decision on the issue of custody (and now erroneously claims that she was denied that opportunity), we are forced to consider whether perceptions of justice may have been obscured by the distorted picture painted by Young in his briefs and during oral argument.

Mr. Young insisted that the psychologist's report came "out of the clear blue sky." However, Young's statement is thoroughly belied by the record. Lawrence and her counsel were well aware of the appointment of an independent psychologist, both through discussion with the court and, as noted above, through direct correspondence with Dr. McQueen. Moreover, with the exception of one psychologist, attorney Young stated to Judge Whitehead that he did not care who the judge appointed to conduct the evaluation.

We attach by way of an appendix to this opinion a transcript of contradictory statements made by Young at oral argument. (See Appendix B.) A careful review of all documents before us indicates that Judge Whitehead set forth a procedure whereby permanent custody would be determined, complete with a provision for a hearing. Pursuant to that procedure, Pearson and Lawrence filed their reports on May 2, 1991, and May 21, 1991, respectively. At the time of filing, Young attached a cover page to his client's report which reads: "Plaintiff, GALE LAWRENCE PEARSON, by and through her attorney, RICHARD W. YOUNG, ESQUIRE, hereby respectfully submits her written report, with exhibits attached thereto."

Over two months after the filing of the aforementioned reports, Pearson and Lawrence both filed a "Request for Submission of

Motion" which instructs the court that the "above-entitled matter be submitted to the Court *for decision."* (Emphasis added.) Thereafter, the district court did *precisely* what was asked of it. Incredibly, at oral argument Young attempted to persuade this court that, despite his extensive experience in family law, he felt that the form he used was the only way to submit something to the court. We reject as inherently unbelievable counsel's explanation for using the printed form, the purpose for which is clear on its face, over two months after he had submitted the Lawrence report to the court with the cover sheet referred to above.

Approximately one year after counsel had submitted the matter, the report of Dr. McQueen was sent directly to Judge Whitehead according to the procedure which had previously been explained and agreed upon by counsel. It is evident, and we so conclude, that Judge Whitehead, upon seeing form requests from both parties for a decision, properly proceeded to issue a permanent custody order as requested by counsel. Moreover, the procedure which the judge outlined, and which was approved by counsel, was followed until the court received, from both parties, requests that the matter be submitted to the court for decision.

In order to maintain an orderly flow of cases through the judicial system, the district court must be able to rely upon the procedural requests of counsel in resolving matters. To assume that Judge Whitehead or any other district court judge could have divined Young's unexpressed and contradictory intent to have a hearing from the plain terms of the submission form is, at best, totally unrealistic. Moreover, the travesty is compounded by attempting to blame the district judge for not somehow sensing the thought processes of counsel and scheduling a hearing contrary to the written request that the matter be submitted for a decision.

In light of the serious nature of a child custody determination and because of the inadequate representation received by Lawrence, which may have precluded her from presenting her position at a hearing, we feel constrained to remand this matter so that she may voice her views prior to a permanent custody determination.

The Washoe County Family Court was created on January 4, 1993, and empowered with exclusive jurisdiction to preside over child custody matters. *See* NRS 3.0105 and NRS 3.223. Although Judge Whitehead could properly complete this custody determination that he has presided over for such a lengthy period, we do not consider it fair to him that he do so. This matter has been sufficiently tainted by distorted public comments to make it

extremely difficult for the judge to carry out his responsibilities in an atmosphere conducive to an objective determination of the best interests of the children. We nevertheless encourage the family court, upon remand, to become intimately familiar with the voluminous record of prior proceedings in this matter. Great expenditures of time, energy and scarce financial and judicial resources have resulted from the bitter perpetuation of this litigation. Moreover, the acrimony exhibited in this particular case has given rise to what may fairly be described as inappropriate conduct. The family court should carefully scrutinize this conduct in an effort to reach a custody resolution which will best serve the interests of the Pearson children. We also note that we remand this matter with a substantial degree of reluctance given Lawrence's failure to participate in the interviewing process with Dr. McQueen and Young's derelictions and lack of candor as an officer of the court.

## CONCLUSION

After careful review of the record and oral argument, we conclude that the district court acted properly in this action and genuinely sought to promote the best interests of the children in an atmosphere otherwise only incidentally attuned to their welfare. We nevertheless conclude, for reasons stated above, that the order issued below will be vacated and the matter remanded to the family court for further proceedings consistent with this opinion. In the interim, however, the children shall remain in the custody of Pearson in accordance with the district court's determination. The family court is directed to thoughtfully consider all relevant documentation before it and to conduct a hearing for the purpose of determining the parent best suited to have primary custody of the children.[2]

YOUNG, and SPRINGER, JJ., concur.

---

[2]The concurring opinion concluding that the district judge did not follow the law draws inferences unwarranted from the record. Although it is true that the procedures outlined in the trial held in August 1989 and in the August 1990 decree were not followed, it is clear that the deviation resulted from further discussions between the district court judge and counsel for both parties. Despite attorney Young's denial of the mention of Dr. McQueen in the June, 1991 in-chambers conference (*after* the dates for other procedural arrangements had passed) discussed by the parties in their respective briefs and during oral argument, it is clear that Young never contacted Judge Whitehead to object to Dr. McQueen's evaluation or to express surprise or disapproval of the procedure followed by the court. It is also clear that the attorneys for both parties filed requests with the court for submission of the motion without argument or a hearing.

Contrary to the concurring justice's opinion, the trial judge never once deprived the parties of the right to be heard. Attorney Young never asked for a copy of the McQueen report, never asked for a hearing and the opportunity

## APPENDIX A

The following colloquy transpired at the end of the presentation of evidence by both parties. There Judge Whitehead indicated:

> The Court: What would the parties think to the Court appointing a psychiatrist to interview both the plaintiff and the defendant in this matter and report directly to the Court?
>
> Mr. Logar: Your Honor, I would have no objection to that. . . .
>
> . . . .
>
> Mr. Young: We have no objection to an outside psychiatric evaluation, your Honor.
>
> . . . .
>
> The Court: Let me ask you both: Mechanically, do you want—I'm trying to think both how to move this along and keep your costs down. I'm sure they're astronomical anyway. Do you want a physician to simply send me written reports and submit it? Do you want him called back in to testify and be cross-examined?
>
> . . . .
>
> The Court: My next question was: Mechanically, do we do it—do we ask the doctor to submit written reports directly to the Court and close it, or do you want to call him in and both of you take a shot at him? Mr. Young?
>
> . . . .
>
> Mr. Young: That's a difficult one to answer, your Honor, because it obviously depends upon what Mr. Logar is going to do.
>
> The Court: I think you both should do the same thing.
>
> Mr. Young: I'm sure we would.
>
> The Court: What I meant, would agree right now, just

---

to cross-examine Dr. McQueen, never asked the court to "reopen" the evaluation process so that Lawrence could be interviewed by Dr. McQueen, never complained to the district court judge that the custody order was issued contrary to the procedure he expected the court to follow, and not only failed to object to Dr. McQueen's participation, but to the contrary, expressed a very belated willingness on the part of his client to be interviewed by Dr. McQueen. Moreover, it is equally clear that both parties knew that the district court judge had sought the evaluations of Dr. McQueen in order to assist him in reaching a decision concerning the issue of permanent custody. The original custody order entered as part of the diviorce decree on August 14, 1990, specified that the provision regarding custody was strictly temporary. Neither party has asserted the nonsensical proposition that they assumed that Dr. McQueen's evaluative report was without purpose or the product of the court having nothing better to do.

Finally, I recall no place in the record where appellant's counsel has contended that he did not ask Judge Whitehead for a hearing or for the reconsideration of his ruling because he felt such a request would have been futile.

submit it or to agree right now to have a hearing in which the expert would testify.

. . . .

The Court: Okay. Let me just set the procedures: I will appoint a physician to report back to the Court in writing. Within five days after the reporting, present it to counsel. They are—if they want to file a request for an oral hearing and state the reasons, the Court will consider at that time whether the reasons warrant having an oral hearing. That will be the procedure.

. . . .

Mr. Young: Your Honor, I understand the process.

. . . .

## APPENDIX B

The following colloquy took place at oral argument before this court:

JUSTICE STEFFEN: You're telling me there wasn't even a conference in chambers and you didn't know there was a professional and that Dr. McQueen surfaced out of the blue. Is that correct?

Mr. Young: . . . there very well may have been discussions about what we were going to do with this case, and there may have been discussions about the possible use of a mediator, a referee or something else. . . .

. . . .

Thereafter, Mr. Logar was addressed as follows:

JUSTICE STEFFEN: Counsel, before we get to that (inaudible), Mr. Young, as an officer of the court, recalls no mention of Dr. McQueen in a conference in chambers and indicates that there may have been a discussion about the possibility of a mediator or someone being brought in, period. Now, in your brief, you indicate that Judge Whitehead specifically informed counsel for the parties that he was appointing Dr. McQueen to act as a mediator, to meet with both of the parties and the trial judge directed the parties to meet with Dr. McQueen. . . . Is that correct?

Mr. Logar: Yes. Counsel's recollection may be faulty. Mine is not. Specifically, in chambers on June 19, the district judge indicated to us that he wanted to appoint a professor at the University of Nevada named McQueen, who is a clinical psychologist that he had used in the past to do assessments, he called it, in custody matters and was going to appoint Mr. McQueen, at which time there was no objec-

tion by either counsel made. He indicated that he wanted the parties to contact McQueen and make arrangements with him so that he could do his assessment and that he would make a report to the court. We never anticipated that the report would be made public, and by that I mean sent to the parties or their counsel. We considered, at least on the respondent's side, that that report would be held in camera by the court, as such assessments are, and that we would be notified when the report had been submitted. And at that point we could request copies of it, make objections, have a hearing if we decided to, and that was the procedure that was discussed.

. . . .

JUSTICE STEFFEN: Mr. Logar, if I can interrupt you here. I assume that this is a transcript. We are informed that the judge met with both parties and the following colloquy occurred. First, by the judge:

The Court: What would the parties think to the court appointing a psychiatrist to interview both the plaintiff and the defendant in this matter and report directly to the court? Mr. Logar?

Mr. Logar: Your Honor, I would have no objection to that.

. . . .

The Court: Mr. Young?

Mr. Young: We have no objection to an outside psychiatric evaluation, your Honor.

. . . .

The Court: My next question was: Mechanically, do we do it—do we ask the doctor to submit written reports directly to the court and close it, or do you want to call him in, and both of you take a shot at him? Mr. Young?

. . . .

The Court: Okay. Let me just set the procedures: I will appoint a physician to report back to the Court in writing. Within five days after the reporting, present it to counsel. They are—if they want to file a request for an oral hearing and state the reasons, the Court will consider at that time whether the reasons warrant having an oral hearing. That will be the procedure.

JUSTICE STEFFEN: So, evidently, this was discussed.

. . . .

JUSTICE STEFFEN: . . . So, if this is correct, the entire procedure was discussed with both attorneys. Neither made an objection. . . . Rather than asking for hearing, [the

motion to submit form] is in effect saying that the matter is submitted as it states right in here, to the court for decision.

. . . .

Mr. Logar: Your interpretation is correct. What you are referring to are comments made at the conclusion of the trial back in 1990. . . .

. . . .

JUSTICE STEFFEN: And then after this occurred, later on there was the conference in chambers where Judge White-head specifically mentioned the name of Dr. McQueen?

Mr. Logar: Exactly.

Then on rebuttal, Mr. Young represented to this court the following:

Mr. Young: I absolutely disagree that there was a meeting with respect to the appointment of this particular man McQueen with all of the procedures, etc., set forth by Mr. Logar. That didn't happen. That did not happen.

. . . .

Mr. Young: And it has never, I am telling you as an officer of this court and many other courts, that was never, never, ever the agreement.

JUSTICE STEFFEN: Well, Mr. Logar says that it was.

. . . .

JUSTICE STEFFEN: So what are we to do?

Mr. Young: Mr. Logar is wrong, because that was not the agreement, ever.

JUSTICE STEFFEN: Well, I understand that it is a very, it's a very complex thing, Mr. Young, but it appears to me that there are some strange things that occurred. Because clearly you knew that Dr. McQueen was involved. . . .

SHEARING, J., with whom ROSE, C. J. joins, concurring:

I agree that the custody order issued by the district court should be vacated and the case remanded to the family court for a redetermination of custody. However, I do not agree with the majority opinion that the proceedings below conformed to the law of this state.

After a long and acrimonious trial, the district court issued Findings of Fact, Conclusions of Law, Judgment and Decree of Divorce which were filed on August 14, 1990. The document contained an order for child custody which was to be effective until June 1, 1991. The parties were to have joint physical and legal custody of their two sons, but the mother was to have primary care, custody and control of James, while the father was

to have primary care, custody and control of Cameron. The order spelled out a detailed visitation schedule. The order also required the parties to submit a written report to the court describing in detail certain actions in relation to their children. The court further ordered that "a hearing will be held in the month of June, 1991, in this Court, for the purpose of reviewing the . . . child custody and visitation order."

The reports required by the order were filed by the parties, but the court-ordered hearing was never held. Custody remained the same until July 23, 1992, at which time the district court issued an order granting the father primary physical care, custody and control of both boys. The change in custody was largely based on a report by clinical psychologist, Robert McQueen, which was dated May 11, 1992. There is apparently no dispute that the court gave no notice to the mother or her counsel either that McQueen had been appointed or that a report had been prepared or submitted.

Three years earlier at the trial in August 1989, the court and counsel had discussed the possibility of the court appointing a psychiatrist to interview the parties and submit a report. The court outlined a procedure whereby the court would appoint a physician to report back to the court; within five days, it would present the report to counsel; then counsel could file a request for an oral hearing which the court would consider. However, the subsequent decree of August 14, 1990, outlined a different procedure without any mention of an independent evaluation. Neither the procedure outlined at trial in August 1989 or in the August 1990 decree was followed.

The 1992 order depriving the mother of primary physical custody of her son was issued without notice that change of custody based on new information was even being considered. Assuming that the Request for Submission of Motion submitted by counsel in 1991 meant that the parties had waived the oral hearing which the court had promised, it cannot be construed to waive any right to any notice or hearing regarding subsequently developed information known to the court alone.

The mother was given no opportunity to review or contest McQueen's report. McQueen did send her a letter dated March 30, 1992, informing her that he was preparing a report. However, under the particular circumstances of this case, the mother did not even have an opportunity to be consulted before the report was prepared in view of the fact that she was on a medical school surgical rotation in Las Vegas at the time of the evaluation. When her attorney contacted McQueen in May, McQueen replied that the report had been submitted and stated, "When I received no

response from Ms. Lawrence to my letter I frankly felt it would be presumptuous of me to press her further and I did not do so." In other words, he never even bothered to check whether she had received his letter and the court itself had given no notice of the appointment to either the mother or her counsel.

There is no dispute that the parties had three years earlier agreed to an examination by experts, but there was never any waiver of their rights to cross-examine the experts, to present rebuttal evidence, or to be heard. In fact, the court had outlined a procedure for assuring these rights, but later did not follow it. That a mother should be deprived of the physical custody of her child without these basic rights violates the concepts of fundamental fairness and due process which is basic to our legal system.

This court has made clear that a court making an award of custody without notice or hearing is acting in excess of its jurisdiction. Matthews v. District Court, 91 Nev. 96, 531 P.2d 852 (1975). In *Matthews*, the judge had issued a divorce decree reserving a determination of custody until "a later date following psychiatric and/or psychological examinations and testimony of the parties as stipulated." 91 Nev. at 97, 531 P.2d at 852. Subsequently, the judge changed the child custody without any further notice to the parties. This court granted a writ of prohibition restraining enforcement of the order and "restraining any transfer of the parties' children from the plaintiff-petitioner's care without notice and due opportunity to be heard." *Id.* at 98, 531 P.2d at 853. Although the decree stated that permanent custody would be determined later, this court required notice and hearing because "the decree did not specify how expert opinions were to be received by the court, whether the parties had waived cross-examination of the experts, what rebuttal evidence would be adduced, nor the time or manner in which the issue of child custody would be brought before the court for its final consideration." *Id.* at 97, 531 P.2d at 852.

In the case before us, the degree stated the time and manner in which the issue would be brought before the court, namely at a hearing in June of 1991, but this hearing never took place. Instead, a psychologist was appointed apparently much later, and the court made a decision based on this psychologist's report without notice, without the opportunity for further input or cross-examination or presentation of rebuttal evidence. This is unacceptable under our system of justice. This court reaffirmed this view most recently in Moser v. Moser, 108 Nev. 572, 576-577, 836 P.2d 63, 66 (1992), saying:

Litigants in a custody battle have the right to a full and fair hearing concerning the ultimate disposition of a child. Matthews v. District Court, 91 Nev. 96, 97, 531 P.2d 852, 852 (1975). At a minimum, observance of this right requires that before a parent loses custody of a child, the elements that serve as a precondition to a change of custody award must be supported by factual evidence. Furthermore, the party threatened with the loss of parental rights must be given the opportunity to disprove the evidence presented.

Vacating the custody order and remanding the matter to the family court for a redetermination of custody is required.