MARK MICHAEL FORD, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 43473

July 20, 2006                                                    138 P.3d 500

---

[Rehearing denied September 27, 2006]

[En banc reconsideration denied November 2, 2006]

*Philip J. Kohn*, Public Defender, *Curtis S. Brown*, Chief Deputy Public Defender, and *Sharon G. Dickinson*, Deputy Public Defender, Clark County, for Appellant.

*George Chanos*, Attorney General, Carson City; *David J. Roger*, District Attorney, *James Tufteland*, Chief Deputy District Attorney, and *Giancarlo Pesci*, Deputy District Attorney, Clark County, for Respondent.

Before MAUPIN, GIBBONS and HARDESTY, JJ.

## OPINION

By the Court, HARDESTY, J.:

In this appeal, we consider whether NRS 62C.010(2)(a), the Juvenile Courts statute requiring parental notification that a child is in custody, precludes law enforcement interviews of juveniles

suspected of criminal misconduct. We conclude that the absence of notification under the provision does not preclude juvenile interviews and, further, does not bar eventual admission at trial of voluntary statements taken during such interviews. We also conclude that parental notification or presence during juvenile interviews is only a factor in resolving whether such statements are voluntary.

We also consider Ford's arguments on appeal that the officers unlawfully seized his stocking cap and sweatshirt containing the victim's blood stain, the jury instructions defining murder and manslaughter failed to properly define a reasonable person standard as a juvenile, his warrantless arrest was unconstitutional, the use of the autopsy report and substituted expert violated his right to confrontation, and the admission of prior bad acts was an abuse of discretion. We disagree and affirm Ford's convictions for second-degree murder with the use of a deadly weapon and for burglary while in possession of a deadly weapon.

## FACTS

Ford was fifteen years old when he traveled on his moped to burglarize his former Las Vegas neighborhood. Ford arrived at Vincent Gomes' residence at approximately 2:45 p.m. Using a gardening tool that he had stolen, Ford removed a bathroom window screen and started to climb into the house. As he entered, he was immediately seized by Gomes and pulled into the bathroom.

When Gomes asked Ford why he was breaking into the house, Ford professed that he was only trying to use the restroom. Gomes then put his arm around Ford and moved him into the kitchen to call the police. In an effort to escape, Ford grabbed a knife from the kitchen sink and stabbed Gomes in the neck. Ford then ran into the garage and opened the garage door. Realizing, however, that he had left his stocking cap in the residence, Ford re-entered the house, stepping into a puddle of Gomes' blood. Ford retrieved his stocking cap and fled the residence through the back door. Gomes was pronounced dead at the scene. The stab wound filled his lungs with blood obstructing his ability to breathe.

Officer Dennis DeVitte received a report of a potential murder which described Ford as a suspect based on the statements of several witnesses who had seen Ford in the area. At approximately 5:45 p.m., DeVitte was in his patrol car when he located Ford on his moped. As DeVitte turned his vehicle around to pull Ford over, Ford parked and got off his moped. DeVitte ran over to Ford and, upon ascertaining his name and address, handcuffed him and placed him in the back of DeVitte's patrol car. Detective Ken Hardy then arrived and informed Ford that his name had surfaced in an investigation they were conducting. Upon Hardy's request, Ford agreed to go to a nearby police station for questioning.

Prior to questioning Ford, Hardy informed him that he was under arrest for driving a moped without a driver's license and advised Ford of his *Miranda* rights, including the right to have a parent present during questioning. Ford acknowledged that he understood these rights and signed a card waiving them. The interview was tape-recorded and lasted for approximately thirty minutes, at which point Ford asked that his mother be notified. Police then called Ford's mother. Throughout the interview, Ford was handcuffed to a table and maintained that he was not in the neighborhood where Gomes was murdered that day.

After the interview, Ford agreed to provide the detectives with fingerprints, a buccal swab, and photographs. In addition, Hardy saw what he believed to be blood on the stocking cap and sweatshirt Ford was wearing and told Ford "we are taking your clothes one way or another." Ford was then released to his mother approximately two hours after being first detained.

Ford was later arrested and indicted on charges of murder with the use of a deadly weapon, burglary while in possession of a deadly weapon, and invasion of the home. Ford entered a plea of not guilty to all counts. After a five-day trial, the jury returned a verdict finding Ford guilty of one count of second-degree murder with the use of a deadly weapon and one count of burglary while in possession of a deadly weapon. Ford was sentenced to life with the possibility of parole for second-degree murder, an equal and consecutive term for the deadly weapon enhancement, and 22 to 96 months for burglary while in possession of a deadly weapon. The sentence on count two runs consecutive to the sentences on count one.

## DISCUSSION

### Tape-recorded statement

Initially, Ford argues that the admission of his tape-recorded statement was error because he should not have been taken into custody for a juvenile traffic offense and because the police failed to notify his parents prior to the interrogation. With respect to the first contention, Ford claims that his detainment violated NRS 62C.070, which requires an officer who stops a juvenile for a traffic offense to issue a citation and release the juvenile. In this, Ford maintains there was no basis for his custodial status. We disagree.

NRS 62C.070(1) provides that "[i]f a child is stopped by a peace officer for a violation of any traffic law or ordinance which is punishable as a misdemeanor, the peace officer may prepare and issue a traffic citation pursuant to the same criteria as would apply to an adult violator." Moreover, subsection 2 of that statute provides that if the child signs a written promise to appear in court for the traffic violation, the officer shall not take the child into cus-

tody. While we acknowledge that NRS 62C.070(1) does not provide a basis for custody, nothing in that statute precludes an officer from detaining a criminal suspect, juvenile or otherwise, based on NRS 171.123, "under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a crime."[1]

Here, Officer DeVitte located Ford on his moped after learning that a person named Mark Ford, of Ford's age, build, and dress was a suspect in Gomes' death and was driving a moped. Thus, DeVitte had reasonable grounds to suspect Ford was the individual described in the police report and therefore had lawful grounds to detain Ford.[2] Further, after Ford was detained and placed in the back of DeVitte's patrol car, he consented to being interviewed by Detective Hardy at a nearby police station. Because Ford was properly detained and consented to being interviewed, his argument that the traffic citation statute precludes his detention is without merit.

Ford next contends that his statement should have been suppressed because his parents were not notified that he was in custody. Relying upon NRS 62B.330 and NRS 62C.010, Ford claims parental notification is required when a juvenile is taken into custody prior to being interviewed in connection with a murder. We take this opportunity to clarify our jurisprudence concerning parental notification as a prerequisite to interrogating juveniles suspected of criminal offenses.

NRS 62C.010(2)(a) provides that when a child is taken into custody, "[t]he officer shall, without undue delay, attempt to notify, if known, the parent or guardian of the child." Pursuant to NRS 62B.330, the juvenile courts have exclusive original jurisdiction over a child who is alleged to have committed a delinquent act except where the juvenile is charged with murder.[3] Ford maintains that because he was not charged with murder at the time of his interrogation, the police were required to notify his parents prior to

---

[1]NRS 171.123(1); *Morgan v. State*, 120 Nev. 219, 88 P.3d 837 (2004); *State v. Bayard*, 119 Nev. 241, 71 P.3d 498 (2003); *see also Stuart v. State*, 94 Nev. 721, 722, 587 P.2d 33, 34 (1978).

[2]*State v. Wright*, 104 Nev. 521, 523, 763 P.2d 49, 50 (1988) ("A stop is lawful if police reasonably suspect that the persons or vehicles stopped have been involved in criminal activity.").

[3]*See also Shaw v. State*, 104 Nev. 100, 102, 753 P.2d 888, 889 (1988) ("[T]he juvenile courts hold exclusive original jurisdiction over proceedings concerning a child who has committed a delinquent act."), *overruled on other grounds by Alford v. State*, 111 Nev. 1409, 906 P.2d 714 (1995).

interrogating him. As a result, Ford contends that his statement should have been suppressed.

In *Shaw v. State*, this court held that a juvenile who was arrested and taken into custody for murder was not entitled to parental notification under NRS 62C.010.[4] This court declined to suppress Shaw's inculpatory statements, finding that the juvenile protections afforded by NRS Chapter 62 do not reach situations where a juvenile is charged with murder.[5] *Shaw* implies that the statute is inapplicable when a juvenile is taken into custody during the course of a murder investigation prior to a formal arrest or prior to the institution of formal charges. Given Ford's claim that our holding in *Shaw* only excuses parental notification after arrest or formal institution of charges, we take this opportunity to revisit and clarify our opinion in *Shaw*.

Our review of the parental notification requirement contained in NRS 62C.010 indicates that its purpose is to accomplish parental awareness of a child's custody status, not to impose a legislative mandate precluding interrogations of juveniles without parental notification. NRS 62C.010 does not impose a duty on law enforcement to notify a juvenile's parents as a condition to obtaining a voluntary statement from the juvenile, regardless of the nature of the crime being investigated. Rather, that statute serves only to notify parents that their child is in the custody of the police, and it offers no remedy when police fail to do so.

Going further, nothing in the statute permits the parents of a child in custody to participate in an interview of the child by law enforcement. This is underscored by our recent decision in *Elvik v. State*, in which we recognized that a parent's absence from a custodial interrogation of a juvenile is only a factor within the totality of circumstances concerning the voluntariness of the juvenile's statements.[6] Therefore, we clarify *Shaw* to hold that the objectives of parental notification do not prevent juvenile interrogations in the absence of parental notification, but rather, such information is a factor to be considered in determining the voluntariness of that statement.[7] Consequently, NRS 62C.010 has no bearing on law

[4]*Id.* at 104, 753 P.2d at 890.

[5]*Id.*; *see also McCurdy v. State*, 107 Nev. 275, 809 P.2d 1265 (1991) (stating that suppression of a minor's confession was not warranted despite the fact that his parents were not notified when he was taken into custody because he was seventeen and therefore not a child in the usual sense of the word).

[6]114 Nev. 883, 891, 965 P.2d 281, 286 (1998).

[7]*Id.* at 890-91, 965 P.2d at 286. Elvik's mother was at the police station during his interrogation, but she was not allowed to be present during the ques-

enforcement decisions to interview juvenile suspects and only limited bearing on whether a juvenile's statement is voluntary.

Here, Ford was fifteen years old at the time of the murder. Upon being detained, Ford agreed to accompany Hardy to a nearby police station to be interviewed about an investigation that was being conducted. At the police station, Ford was told that he was under arrest for driving a moped without a license. Ford was given his *Miranda* rights and advised that he could have a parent present during questioning.[8] He waived his *Miranda* rights and the opportunity to have his parents present. Because Ford's right to parental notification did not bear on the authority of the investigators to interview him, we conclude that NRS 62C.010 does not operate as a procedural bar to the admissibility of an otherwise voluntary statement. Here, Ford's statement was voluntary and therefore the district court properly admitted it.[9]

*Stocking cap and sweatshirt*

The district court suppressed all of the physical evidence obtained from Ford while he was in custody except for his stocking cap and sweatshirt, which it determined were in the detectives' plain view. Ford argues that the detectives were not in a position to lawfully view the blood stains contained on his stocking cap and sweatshirt and therefore the search violated his Fourth Amendment rights. An object is deemed to be in plain view when the intrusion of the police is lawful, the discovery of the incriminating evidence by the police is inadvertent, and it is immediately apparent that the

---

tioning of her son. Nevertheless, the court concluded that the statement he gave was voluntary.

[8]In *Marvin v. State*, 95 Nev. 836, 839 n.4, 603 P.2d 1056, 1058 n.4 (1979), we stated that, absent extraordinary circumstances, police should always have a responsible custodian present during interviews of children. We note, however, that this requirement has not been recognized as a constitutional right. *See Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) (stating that there is no federal statutory or constitutional requirement that juvenile's parents be notified before obtaining a confession); *People v. Pogue*, 724 N.E. 2d 525, 531-32 (Ill. App. Ct. 1999) (stating that juvenile has "no *per se* right to have a parent present during" or to consult with a parent before questioning). We do not need to reach that question in this appeal.

[9]" '[F]indings of fact in a suppression hearing will not be disturbed on appeal if supported by substantial evidence.' " *Peck v. State*, 116 Nev. 840, 846, 7 P.3d 470, 474 (2000) (quoting *Stevenson v. State*, 114 Nev. 674, 679, 961 P.2d 137, 140 (1998)).

We likewise reject Ford's argument that he was not properly given his *Miranda* warnings; the record clearly belies this argument.

items they observed may be evidence of a crime.[10] Because we have concluded that Ford was lawfully detained, and that the observation of blood on the stocking cap and sweatshirt were inadvertent and immediately apparent to be evidence of a crime, the admission of the stocking cap and sweatshirt did not violate Ford's Fourth Amendment rights.[11]

### Jury instructions

Jury instructions 19 through 21 gave various definitions of murder in the first and second degree as well as voluntary and involuntary manslaughter in connection with the reasonable person standard. Ford argues that these jury instructions were erroneous because they held Ford to an adult standard of reasonableness as opposed to a child standard. Ford, however, did not object to these instructions at trial, and therefore, this court will review the instructions only for plain or constitutional error.[12]

The jury instructions at issue adequately permitted Ford's argument concerning the reasonable person standard. In fact, when arguing the reasonable person standard during closing argument, Ford's counsel stated, ''[Y]ou have to consider what was going on in the mind of that child at that time.''[13] Accordingly, we conclude the jury instructions do not amount to plain error.

### Warrantless arrest

As noted, Ford was released to his mother after the interview with police. When the police learned that Ford's fingerprints

---

[10]*Luster v. State*, 115 Nev. 431, 434-35, 991 P.2d 466, 468 (1999) (stating that in order for an object to be deemed in plain view, three elements must be met: ''(1) the initial intrusion of the police must be lawful; (2) the police must 'inadvertently' discover the incriminating evidence; (3) it must be 'immediately apparent' to the police that the items they observe may be evidence of a crime'').

[11]We further note that Ford's argument that the buccal swab and fingerprints he provided to police violated his Fourth Amendment rights and therefore should have been suppressed is without merit. Ford was in custody at the time he provided the police with a buccal swab and his fingerprints. *See Scott v. State*, 83 Nev. 468, 471, 434 P.2d 435, 436-37 (1967) (holding that the taking of fingerprints does not implicate Fourth or Fifth Amendment rights). Moreover, Ford consented to the buccal swab and fingerprints. As such, his contentions are without merit.

[12]*Bridges v. State*, 116 Nev. 752, 761, 6 P.3d 1000, 1007 (2000).

[13]Additionally, during closing arguments, Ford's counsel argued that

Mark did not intend to kill Vincent Gomes. There's no intention. Mark is a boy. Now, despite the seriousness of this charge and the horrible, horrible mistake he made that day, it doesn't change the fact that he still is a boy. He thinks like a child; he acts like a child; he reacts like a child. In his mind, nothing bad is ever going to happen.

matched those found at the crime scene, they traveled to Ford's home where his mother invited them inside. She then called Ford to come downstairs and speak with the officers. Ford spoke with the officers and continued to deny being at Gomes' residence. Ford was then arrested and booked into the Clark County Detention Center on charges of murder with the use of a deadly weapon and burglary while in possession of a deadly weapon. Ford argues his arrest was illegal because the officers did not have a warrant when arresting him inside his home. We disagree.

It is well-settled that a consensual entry excuses the Fourth Amendment's warrant requirement for an arrest at a suspect's home.[14] Because Ford's mother allowed the police into their home, Ford's arrest was constitutional.

*Autopsy report*

Dr. Paul Telgenhoff performed the autopsy on Gomes but was unavailable at the time of trial. Prior to trial, the State filed a notice of expert witnesses informing the district court and Ford that Dr. Larry Simms would testify in place of Dr. Telgenhoff, regarding the autopsy of Gomes. Ford stipulated to the substitution and only objected as to Dr. Simms' ability to give an opinion as to how the crime occurred. The district court granted Ford's request to limit Dr. Simms' testimony. Ford now argues that the admission Dr. Simms' testimony in place of Dr. Telgenhoff violated Ford's Sixth Amendment right to confrontation. We disagree.

The right to confrontation may be waived by the failure to object to the use of affidavits or declarations prepared pursuant to a stipulation.[15] "The test for the validity of a waiver of a fundamental constitutional right is whether the defendant made 'an intentional relinquishment or abandonment of a known right or privilege.' "[16] Here, Ford waived his right to confrontation when he stipulated through counsel to the substitution of Dr. Simms for Dr. Telgenhoff. Accordingly, Ford's argument on appeal is without merit.

---

[14]*Murray v. State*, 105 Nev. 579, 583, 781 P.2d 288, 290 (1989) (citing *Payton v. New York*, 445 U.S. 573, 576 (1980)).

[15]*Sparkman v. State*, 95 Nev. 76, 81, 590 P.2d 151, 155 (1979); *Drummond v. State*, 86 Nev. 4, 8 n.2, 462 P.2d 1012, 1014 n.2 (1970).

[16]*Raquepaw v. State* 108 Nev. 1020, 1022, 843 P.2d 364, 366 (1992) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)), *overruled on other grounds by DeRosa v. Dist. Ct.*, 115 Nev. 225, 985 P.2d 157 (1999).

*Prior bad acts*

Prior to trial, the State filed a motion to admit evidence of five prior bad acts committed by Ford concerning situations in which he had burglarized the homes of others. Of these five, the district court admitted three prior bad acts pursuant to NRS 48.045(2). Additionally, during trial, Ford testified that he had never previously been in a situation where he was restrained by someone after attempting to burglarize their home and used violence in an effort to escape. On cross-examination, the district court permitted the State to impeach Ford pursuant to NRS 50.085(3), by inquiring about a previous situation in which Ford was being restrained by an individual after attempting to burglarize his home, and Ford kicked him in an effort to escape. Ford argues that the admission of these prior bad acts was in error because the cumulative effect was highly prejudicial. We disagree.

This court has stated that the decision to admit or exclude evidence rests within the discretion of the trial court.[17] Furthermore, "this court will respect the trial court's determination as long as it is not manifestly wrong."[18] Here, the district court determined that three of Ford's five prior bad acts, concerning situations in which he burglarized a person's home, were admissible to prove his intent and/or the absence of mistake when he broke into Gomes' residence. NRS 48.045(2) permits such evidence and therefore the district court did not abuse its discretion.

Moreover, "NRS 50.085(3) permits impeaching a witness on cross-examination with questions about specific acts as long as the impeachment pertains to truthfulness or untruthfulness and no extrinsic evidence is used."[19] Ford testified that he had never been in a situation like the one he found himself in when he stabbed Gomes in the neck. The State cross-examined Ford about an instance where he had kicked a person in an effort to escape. Accordingly, pursuant to NRS 50.085, this line of questioning was proper.

## CONCLUSION

We conclude that Ford was lawfully detained and voluntarily agreed to go to the police station for questioning. Thus, the fact

---

[17]*See Greene v. State*, 113 Nev. 157, 166, 931 P.2d 54, 60 (1997), *overruled on other grounds by Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000).

[18]*Colon v. State*, 113 Nev. 484, 491, 938 P.2d 714, 719 (1997); *see also Bletcher v. State*, 111 Nev. 1477, 1480, 907 P.2d 978, 980 (1995).

[19]*Collman v. State*, 116 Nev. 687, 703, 7 P.3d 426, 436 (2000).

that Ford's parents were not notified prior to Ford's interrogation does not preclude the admission of his voluntary statement. We conclude that Ford's stocking cap and sweatshirt were properly admitted because the officers were lawfully present and the articles of clothing were in plain view when confiscated. We also conclude that the jury instructions were proper, Ford's mother's consent permitted the arrest of Ford at his home, Ford stipulated to the autopsy report thereby waiving his right to confrontation, and the district court properly admitted evidence of Ford's prior bad acts. Consequently, we affirm Ford's convictions of second-degree murder with the use of a deadly weapon and burglary while in possession of a deadly weapon.

MAUPIN and GIBBONS, JJ., concur.