134 Nev., Advance Opinion 8

# IN THE SUPREME COURT OF THE STATE OF NEVADA

RALPH SIMON JEREMIAS,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 67228

FILED

MAR 0 1 2018

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of one count each of conspiracy to commit robbery and burglary while in possession of a deadly weapon, and two counts each of robbery with the use of a deadly weapon and murder with the use of a deadly weapon. Eighth Judicial District Court, Clark County; Valerie Adair, Judge.

*Affirmed.*

David M. Schieck, Special Public Defender, and JoNell Thomas, Chief Deputy Special Public Defender, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Jonathan E. VanBoskerck, Chief Deputy District Attorney, and David L. Stanton and Christopher Burton, Deputy District Attorneys, Clark County,
for Respondent.

BEFORE THE COURT EN BANC.

## OPINION

By the Court, STIGLICH, J.:

This opinion addresses matters which arose during appellant Ralph Jeremias' trial for the murders of Brian Hudson and Paul Stephens. We focus the bulk of our discussion on Jeremias' claim that the district court violated his right to a public trial by closing the courtroom to members of the public during jury selection without making sufficient findings to warrant the closure. Under *Presley v. Georgia*, 558 U.S. 209 (2010), such a violation constitutes structural error, which usually entitles an appellant to automatic reversal of his judgment of conviction without an inquiry into whether the error affected the verdict. But Jeremias did not object to the closure and thus did not preserve the error for appellate review. Under Nevada law, this means he must demonstrate plain error that affected his substantial rights. Following the United States Supreme Court's guidance in *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899 (2017), which discussed the violation of the right to a public trial during jury selection in the context of an ineffective-assistance-of-counsel claim, we hold that Jeremias fails to satisfy plain error review. We also conclude that no relief is warranted on his other claims and that his death sentences are supported by our independent review of the record under NRS 177.055(2).

### FACTS AND PROCEDURAL HISTORY

On June 8, 2009, Brian Hudson and Paul Stephens were found murdered in the apartment they shared. They had both been shot in the head, and it appeared they had been robbed. A witness who lived in the same apartment complex told law enforcement that she saw two men, one with light skin and one with darker skin, near the scene around the time of

SUPREME COURT
OF
NEVADA

(O) 1947A

the murders. Another witness said that, after hearing gunshots, he saw a red truck speed from the complex.

Detectives learned that the victims' credit cards had been used at various locations after the murders. They obtained surveillance videos from those locations and identified a potential suspect and a vehicle he was driving. That vehicle model was often used as a rental car, so detectives searched rental car records. This search led them to Jeremias, who matched the person who had been seen in the surveillance footage using the victims' bank cards. Jeremias was identified by one of the witnesses as the darker-skinned man she had seen in the apartment complex. Jeremias' friend, Carlos Zapata, drove a red truck that was identified by the other witness as that which had left the complex after the shooting.

After further investigation, law enforcement determined that Jeremias committed the murders in the course of a robbery he planned with Zapata and a third individual named Ivan Rios. They were all charged for their roles in the murders; Zapata pleaded guilty and testified on behalf of the prosecution at Jeremias' trial.[1] According to Zapata, Jeremias proposed robbing the victims because he believed there would be drugs and money in their apartment. The plan was for Jeremias, who was friendly with the victims, to gain entry to the apartment. When Jeremias texted the others that everything was ready to go, Zapata would run in and grab the property and Rios would drive them away in Zapata's truck. With the plan set, the group drove to the victims' apartment and Jeremias went inside. While waiting for the signal, Zapata heard gunshots. Jeremias returned empty-handed, and the group fled the scene. Later, Jeremias complained that "it's

---

[1]Rios was tried separately and was acquitted.

Supreme Court
of
Nevada

(O) 1947A

all for nothing" unless they went back to the apartment and took the property he had left behind. Rios apparently balked, so Jeremias and Zapata took a rental car back to the apartment and stole the property. Afterward, the entire group went out celebrating with the victims' money.

Jeremias testified in his own defense. He admitted that he had been in the victims' apartment and that he stole their property, but he denied there was a plan to rob the victims or that he was involved in their deaths. Instead, he claimed he went to the victims' apartment to buy marijuana. When he knocked on their front door, it "popped open" and he saw them with blood on their faces. He knew they were dead, and in a state of shock and intoxication, he decided to take their property.

The jury found Jeremias guilty of conspiracy to commit robbery, burglary while in possession of a deadly weapon, two counts of robbery with the use of a deadly weapon, and two counts of first-degree murder with the use of a deadly weapon. With respect to the murders, the jury unanimously found they were willful, deliberate, and premeditated and were committed during the perpetration or attempted perpetration of a burglary and robbery. The jury also unanimously found each of the aggravating circumstances alleged (that the murders were committed in the course of a robbery, the murders were committed to prevent a lawful arrest, and Jeremias was convicted of more than one murder), and at least one juror found several mitigating circumstances. The jury unanimously concluded that the mitigating circumstances did not outweigh the aggravating circumstances and imposed a sentence of death for each murder. This appeal followed.

## DISCUSSION

*Exclusion of Jeremias' family from the courtroom during jury selection*

Jeremias contends that the district court violated his right to a public trial by excluding members of his family from the courtroom during voir dire. As explained in more detail below, we conclude that Jeremias forfeited any error by failing to object and fails to demonstrate that this court should grant relief under plain error review.

Jeremias' claim is based on *Presley v. Georgia*, 558 U.S. 209 (2010). In *Presley*, the trial court judge noticed an observer sitting in the audience as jury selection was about to commence. *Id.* at 210. The judge told the observer that he had to leave the courtroom because all of the seats would be needed for prospective jurors. *Id.* The observer was the defendant's uncle, and the defendant objected to "the exclusion of the public from the courtroom." *Id.* (quotation marks omitted). The judge reiterated that there would not be enough seats and noted that it would be inappropriate for the uncle to "intermingle" with the prospective jurors. *Id.* When the matter was raised on appeal, the Supreme Court of Georgia determined that the judge had identified a compelling interest for closing the courtroom. *Id.* at 211. Reversing that decision, the United States Supreme Court explained that limited space in a courtroom and concerns that the defendant's family might interact with potential jurors were inadequate reasons to exclude the public entirely, and the trial court was required to take reasonable measures to accommodate public attendance, such as "reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not

SUPREME COURT
OF
NEVADA

(O) 1947A

to engage or interact with audience members." *Id.* at 215. Because the trial court had relied on inadequate reasons to close the proceedings and did not consider reasonable alternatives, the Court determined that it committed structural error, warranting automatic reversal and remand for a new trial. *Id.* at 216.

The facts of this case are similar. Before potential jurors entered the courtroom, the prosecutor objected to having members of Jeremias' family present during the jury selection process. The prosecutor stated that he had a "number of reasons" for wanting to exclude Jeremias' family and was willing to identify them on the record, but defense counsel had already told Jeremias' family that they would be asked to leave the courtroom. Defense counsel remained silent. The judge then stated: "Okay. And just so the family knows, we use every single seat for the jurors. So we would need to kick you out, anyway. At least until we get started with the jury selection and get a few people excused, because we don't have enough chairs. We bring the maximum number we can fit with the chairs." Apparently, Jeremias' family then left the courtroom, and it is unclear when they returned.

At first blush, the facts of this case seem to neatly align with those in *Presley*. But there is an important distinction in that the defendant in *Presley* objected to the closure whereas Jeremias did not. The failure to preserve an error, even an error that has been deemed structural, forfeits the right to assert it on appeal. *United States v. Olano*, 507 U.S. 725, 731 (1993) ("No procedural principle is more familiar to this Court than that a

constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right . . . ." (internal quotation marks omitted)).[2] Nevada law provides a mechanism for an appellant to seek review of an error he otherwise forfeited. NRS 178.602 (explaining when an unpreserved error "may be noticed"). Before this court will correct a forfeited error, an appellant must demonstrate that: (1) there was an "error"; (2) the error is "plain," meaning that it is clear under current law from a casual inspection of the record; and (3) the error affected the defendant's substantial rights. *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003).

For the purposes of this discussion, we will assume that Jeremias satisfies the first two prongs by demonstrating that the district court closed the courtroom to members of the public (his family) for an inadequate reason (courtroom congestion) without balancing other interests or exploring reasonable alternatives. *See Presley*, 558 U.S. at 216. Whether he is entitled to relief therefore turns on whether he can satisfy the third prong: that the error affected his substantial rights.

---

[2]Pointing to *Walton v. Briley*, 361 F.3d 431, 434 (7th Cir. 2004), Jeremias argues that the right to a public trial cannot be forfeited. In addition to disagreeing with *Walton*, we note that it is an outlier and somewhat conflicts with United States Supreme Court precedent. *See generally Levine v. United States*, 362 U.S. 610, 619-20 (1960) (observing, in the due process context, that "[d]ue regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal").

On that point, Jeremias suggests that the error necessarily affected his substantial rights because it has been deemed structural, which means he would have been entitled to automatic reversal without an inquiry into whether he was harmed had the error been preserved. *See Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1908 (2017) (discussing the structural error doctrine). He is mistaken. Under Nevada law, a plain error affects a defendant's substantial rights when it causes actual prejudice or a miscarriage of justice (defined as a "grossly unfair" outcome). *Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008); *Black's Law Dictionary* 1149 (10th ed. 2014) (defining miscarriage of justice). But as the United States Supreme Court recently explained in *Weaver*, a violation of the right to a public trial during jury selection is not inherently prejudicial, nor does it render every trial unfair. Outside of circumstances where a defendant preserves the error at trial and raises it on direct review, a defendant must demonstrate that relief is warranted by pointing to the facts and circumstances of the case presented.[3]

---

[3]Regarding the similar federal plain error test, the Court had previously noted "the possibility" that structural errors "might affect substantial rights regardless of their actual impact on an appellant's trial." *United States v. Marcus*, 560 U.S. 258, 263 (2010) (internal quotation marks omitted). Although we acknowledge that *Weaver* discusses the violation of the right to a public trial in a different context (an ineffective-assistance claim on postconviction review), it makes clear that a violation of the right to a public trial during jury selection only warrants reversal without regard to its effect on the verdict when it has been *preserved* at trial and raised on direct appeal. *See* 582 U.S. at ___, 137 S. Ct. at 1910 ("Thus, in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)); *id.* at ___, 137 S. Ct. at 1911-12 (listing

Here, Jeremias fails to establish that the exclusion of his family for a small portion of voir dire prejudiced him or rendered his trial unfair. Like in *Weaver*, the courtroom was open during the evidentiary portion of the trial, there were members of the venire who did not become jurors but were able to observe the selection process, there is no real assertion that any juror lied or that the prosecutor or judge committed misconduct during voir dire, and there was a record made of the questioning that took place during the closure. *See id.* at ___, 137 S. Ct. at 1913. Although permitting Jeremias' family members to remain in the courtroom would have limited his exposure to the harms the public-trial right was intended to combat, "[t]here has been no showing . . . that the potential harms flowing from a courtroom closure came to pass in this case," nor is there any evidence to suggest that "the participants failed to approach their duties with the neutrality and serious purpose that our system demands." *Id.* Thus, while he might have been entitled to relief under different circumstances, *see generally id.* ("If, for instance, defense counsel errs in failing to object when the government's main witness testifies in secret, then the defendant might be able to show prejudice with little more detail."), he has not demonstrated a violation of his substantial rights under the circumstances presented. Accordingly, he fails to satisfy plain error review.

cases and stating "[t]he errors in those cases necessitated automatic reversal after they were preserved and then raised on direct appeal"); *id.* at ___, 137 S. Ct. at 1912 ("The reason for placing the burden on the petitioner in this case, however, derives both from the nature of the error and the difference between a public-trial violation preserved and then raised on direct review and a public-trial violation raised as an ineffective-assistance-of-counsel claim." (internal citation omitted)).

Even assuming otherwise, the decision whether to correct a forfeited error is discretionary, *City of Las Vegas v. Eighth Judicial Dist. Court*, 133 Nev., Adv. Op. 82, 405 P.3d 110, 112 (2017), and we decline to exercise that discretion here. Considered in context, Jeremias seeks a new trial because members of his family were not able to observe jury selection for a brief period of time (the record suggests a few hours), despite the strong evidence against him and the fact that there is no serious suggestion that their absence had any effect on the proceeding. We are bound by authority which holds that these facts constitute a violation of Jeremias' right to a public trial. *But see Weaver*, 582 U.S. at ___, 137 S. Ct. at 1914 (Thomas, J., concurring) (expressing willingness to reconsider that the right to a public trial extends to jury selection, as held in *Presley*). And the closure should have been avoided, particularly given that members of the public had a right to be present during the jury selection process. *Press-Enter. Co. v. Superior Court of Cal., Riverside Cty.*, 464 U.S. 501, 508-10 (1984). Nevertheless, the violation of Jeremias' right to a public trial was unquestionably trivial under the circumstances.

Perhaps more importantly, Jeremias' failure to object could reasonably be construed as intentional. *See Jezdik v. State*, 121 Nev. 129, 140, 110 P.3d 1058, 1065 (2005) (declining to correct a forfeited error where the record did not establish the reason for counsel's failure to object). The closure did not happen under the radar. *Cf. Gonzalez v. Quinones*, 211 F.3d 735, 736 (2d Cir. 2000) (considering a closure where a court officer locked the doors to the courtroom unbeknownst to the judge and parties). The prosecutor openly stated that he was requesting removal of Jeremias'

family, and indicated that his reasons for doing so involved matters not yet on the record, which he had relayed to Jeremias' attorney. Jeremias said nothing. While not rising to the level of invited error, *see Pearson v. Pearson*, 110 Nev. 293, 297, 871 P.2d 343, 345 (1994) (recognizing that "[i]n most cases application of the [invited error] doctrine has been based on affirmative conduct inducing the action complained of" (internal quotation marks omitted)), or waiver, *see Ford v. State*, 122 Nev. 796, 805, 138 P.3d 500, 506 (2006) (recognizing that a waiver is an intentional relinquishment of a known right), correcting the error under these circumstances would encourage defendants who are aware their rights are being violated to do nothing to prevent it, knowing that they can obtain a new trial as a matter of law in the event they are convicted. This would erode confidence in the judiciary and undermine the integrity of the criminal justice system, *see United States v. Vonn*, 535 U.S. 55, 73 (2002) (emphasizing the value of finality); *Puckett v. United States*, 556 U.S. 129, 140 (2009) (requiring an objection to prevent criminal defendants from "gaming" the justice system), particularly since resolving the entire issue here would have been as easy as setting aside four additional seats and bringing in four fewer prospective jurors, *see Weaver*, 582 U.S. at \_\_\_, 137 S. Ct. at 1912 (observing that "when a defendant objects to a courtroom closure, the trial court can either order the courtroom opened or explain the reasons for keeping it closed," but when a defendant does not object, "the trial court is deprived of the chance to cure the violation"). For all of these reasons, we conclude that no relief is warranted.

*Questioning of Zapata*

Jeremias next challenges the State's questioning of Zapata, arguing that the prosecutor did not follow correct procedures to refresh Zapata's recollection and used a transcript to guide his testimony.[4] *See* NRS 50.125 (discussing the refreshing recollection doctrine).

"Before refreshing a witness's memory it must appear that the witness has no recollection of the evidence to be refreshed." *Sipsas v. State*, 102 Nev. 119, 123, 716 P.2d 231, 233 (1986). Without first establishing that Zapata's memory needed refreshing, the prosecutor repeatedly referred him to a transcript of his interview with law enforcement during direct examination. The prosecutor also asked Zapata to read aloud from the transcript instead of testifying from his memory. This questioning was inappropriate, and we conclude that the district court abused its discretion in overruling Jeremias' valid objections to it. *See* NRS 50.115 (recognizing that the district court has discretion to control the questioning of witnesses).[5] The prosecutor apparently believed his method of questioning was justified because Zapata admitted that he had not "memorized" the

---

[4]Jeremias challenges this questioning on other grounds, but he did not contemporaneously object on those grounds and fails to demonstrate plain error regarding them.

[5]In reaching this decision, we decline to consider the prosecutor's explanation, raised for the first time at oral argument on appeal, that there was some sort of arrangement with the defense to question Zapata in this manner to avoid testimony that they had agreed would not become part of trial. We also decline to reconsider Jeremias' request to expand the record to include Zapata's testimony from Rios' trial. We base our decision on the record as it stands.

transcript and did not remember what he told police "word for word." But Zapata's inability to remember what he told police verbatim did not authorize the prosecutor to guide his testimony under the guise of refreshing his recollection, and it certainly did not authorize the prosecutor to ask Zapata to read from the transcript rather than testify from his own memory. *See Rush v. Ill. Cent. R.R. Co.*, 399 F.3d 705, 718-19 (6th Cir. 2005) (explaining that a witness may not read aloud from the writing used to refresh his recollection); 28 Charles Alan Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6184 (2012) (explaining that courts should not permit a witness to retain a writing "where the circumstances suggest that the writing is merely a script that is being read into evidence under the guise of refreshed recollection").

Nevertheless, we conclude that the error was harmless because Zapata directly inculpated Jeremias in the portions of his testimony that were not inappropriately guided. Moreover, the same testimony could have been elicited had the prosecutor followed proper procedure to refresh Zapata's recollection, or to impeach him if the writing failed to jog his memory or if his testimony differed from his prior statement. Therefore, although the district court abused its discretion, no relief is warranted. *See Valdez v. State*, 124 Nev. 1172, 1189, 196 P.3d 465, 476 (2008) ("If the error is not of constitutional dimension, we will reverse only if the error substantially affects the jury's verdict.").

*Testimony of a substitute coroner*

Jeremias asserts that the district court violated his right to confrontation by permitting a coroner to testify who did not conduct the victims' autopsies. Reviewing de novo, *Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009), we conclude that Jeremias' claim fails because the

substitute coroner testified about independent conclusions she made based on photographs from the victims' autopsies. As such, her testimony did not violate the Confrontation Clause. *See Vega v. State*, 126 Nev. 332, 340, 236 P.3d 632, 638 (2010) (holding that admission of an expert's independent opinion based on evidence she reviewed does not violate the Confrontation Clause).

*Testimony regarding plastic fragments*

Jeremias asserts that the district court abused its discretion by permitting members of law enforcement to testify about fragments of plastic found strewn about the crime scene without first being qualified as experts. Jeremias, however, did not contemporaneously object on this ground; although he objected on this basis before trial, the district court instructed him to lodge objections to the specific portions of the testimony that he believed required an expert, which he did not do. Similarly, on appeal he quotes large portions of testimony regarding the plastic fragments without identifying the specific statements that allegedly required an expert. It is not clear from our review of the record that the testimony in question constituted expert testimony, and therefore, we discern no error, plain or otherwise. Moreover, it is not clear how the testimony was harmful to Jeremias. He asserts it was "highly prejudicial" because it corroborated Zapata's testimony, but he does not explain how, and it is not clear from our review of the record. For all of these reasons, we conclude that no relief is warranted on this claim.

*Video of Jeremias' interrogation*

After Jeremias testified and the defense rested, the State moved to admit a video recording of his interrogation. The defense objected on the ground that the State had already cross-examined Jeremias about

the interrogation, and the district court overruled the objection. On appeal, Jeremias argues that permitting the jury to take the video into deliberations without first playing it in open court violated his right to confrontation.[6] Because the objection below was on a different basis than the claim asserted on appeal, we review for plain error. And Jeremias fails to demonstrate plain error because the video was, in fact, admitted into evidence. *See Martinorellan v. State*, 131 Nev. 43, 49, 343 P.3d 590, 593 (2015) ("To amount to plain error, the error must be so unmistakable that it is apparent from a casual inspection of the record." (internal quotation marks omitted)). He also fails to demonstrate prejudice affecting his substantial rights because the record does not establish that the jurors viewed the video, and even if they did, his concern that the jury might have been misled by the video's editing is based on mere speculation. We therefore conclude that no relief is warranted on this claim.

*Reasonable doubt instruction*

Jeremias contends that the district court erred by giving the reasonable doubt instruction because it stated that the State bore the burden of proving every "material element" of the crime without defining what constitutes a material element. He concedes that his claim fails under *Burnside v. State*, 131 Nev., Adv. Op. 40, 352 P.3d 627, 638 (2015) (holding that the "material element" language is superfluous and should be omitted

---

[6]He also contends that permitting the jury to view the video without playing it in open court violated his right to a public trial, but he fails to demonstrate error that is clear from a casual inspection of the record. *See Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003).

in future cases, but is not so misleading or confusing to warrant reversal), but he argues that *Burnside* was wrongly decided and should be overruled. We decline to reconsider that decision and hold that no relief is warranted on this claim. *See Miller v. Burk*, 124 Nev. 579, 597, 188 P.3d 1112, 1124 (2008) ("[U]nder the doctrine of *stare decisis*, we will not overturn [precedent] absent compelling reasons for so doing." (footnotes omitted)).

*Challenge to an aggravating circumstance*

Jeremias asserts that the aggravating circumstance that he committed the murder to avoid or prevent a lawful arrest pursuant to NRS 200.033(5) is unconstitutional. This court has repeatedly held that the statute does not require an arrest to be imminent and the aggravating circumstance applies when the facts indicate that the defendant killed the victim because the defendant committed a crime and the victim could identify him if left alive. *E.g., Blake v. State*, 121 Nev. 779, 793-94, 121 P.3d 567, 576-77 (2005). Jeremias provides no cause to reconsider these decisions. *See Burk*, 124 Nev. at 597, 188 P.3d at 1124.

*Other penalty-phase claims*

Jeremias raises other challenges to his penalty phase that he did not preserve below. Specifically, he argues that (1) the district court violated his rights to confrontation and notice by admitting Rios' statements to law enforcement, (2) the district court violated his Second Amendment right to bear arms by admitting evidence that he was found in possession of firearms during several arrests, and (3) the prosecutor committed misconduct during the penalty phase. The first two grounds require little

 

discussion as Jeremias fails to demonstrate plain error affecting his substantial rights. Although we reach the same judgment on his third ground, we feel it is necessary to describe that claim in more detail as it somewhat informs our mandatory review discussed below.

Jeremias' first allegation of misconduct during the penalty phase involves the prosecutor's questioning of a defense witness. As part of his mitigation case, Jeremias presented testimony from Tami Bass, a former member of the Nevada State Board of Parole, who testified about the factors the parole board considers when determining whether to grant parole to a prisoner with a parole-eligible sentence. On cross-examination, the prosecutor asked Bass if she was familiar with the case of Melvin Geary. When Bass said she was not, the prosecutor explained that Geary was a murderer sentenced to life without the possibility of parole who had his sentence commuted to a parole-eligible sentence and was released. The prosecutor then stated, "And do you know what Mr. [Geary] did when he was released from prison? . . . He stabbed another man to death." With Geary's case in mind, the prosecutor asked Bass if the parole board can make mistakes, and she agreed.

The prosecutor was entitled to make the valid point that if Jeremias was given a parole-eligible sentence, the parole board could release him, despite Bass' suggestion to the contrary. But the prosecutor could have made this point without mentioning Geary's case, or that Geary had his sentence *commuted* to a parole-eligible sentence, or that Geary went on to kill again. Bringing up the facts of Geary's case the way the prosecutor did was inappropriate. *See Collier v. State*, 101 Nev. 473, 478, 705 P.2d

Supreme Court
OF
Nevada

(O) 1947A

1126, 1129 (1985) (holding that it was inappropriate for a prosecutor to reference facts of another case to promote conclusions about the defendant), *modified on other grounds by Howard v. State,* 106 Nev. 713, 800 P.2d 175 (1990). While these remarks are concerning, the issue presented by Jeremias is whether they were misleading. The prosecutor did not argue or even suggest that Jeremias' sentence could be commuted; therefore, although we disapprove of the remarks, we conclude that Jeremias fails to demonstrate plain error affecting his substantial rights regarding them.

Jeremias also challenges the prosecutor's statement during rebuttal argument that if the jury imposed a life sentence for the murder of Paul, "what's the punishment for [the murder of] Brian? Because whatever you give short of death won't be a day longer in prison. And [Brian's] life is virtually meaningless by a verdict like that." We disapprove of this remark as well. In a case with multiple victims, it is appropriate for a prosecutor to remind the jury that the loss of each victim's life should be reflected in the sentence imposed. It is inappropriate, however, to suggest that justice requires a death sentence because the defendant killed more than one person. The prosecutor's remark in this case tracks closely to the latter, but it is not clearly improper. *See Burnside,* 131 Nev., Adv. Op. 40, 352 P.3d at 649-50 (concluding that the prosecutor's argument that the jury "would give value" to the victim's life by returning a death sentence was not improper in context). There is also no indication that it affected the outcome of the proceeding. Thus, we conclude that Jeremias fails to demonstrate plain error affecting his substantial rights.

*Instruction regarding aggravating and mitigating circumstances*

Jeremias contends that the instruction regarding the weighing of aggravating and mitigating circumstances is unconstitutional because it did not specify that the aggravating circumstances had to outweigh the

 

mitigating circumstances beyond a reasonable doubt. Although this court rejected a similar challenge in *Nunnery v. State*, 127 Nev. 749, 772, 263 P.3d 235, 250 (2011), Jeremias asserts that a recent United States Supreme Court decision, *Hurst v. Florida*, 577 U.S. ___, 136 S. Ct. 616 (2016), calls *Nunnery* into question. He asserts that *Hurst* held for the first time that, where the weighing of facts in aggravation and mitigation is a condition of death eligibility, it constitutes a factual finding which must be proven beyond a reasonable doubt. And, seizing on language from some of this court's prior cases describing the weighing determination as (in part) a factual finding, he asserts that *Hurst* effectively overruled *Nunnery*. We disagree with his interpretation of *Hurst* and of Nevada's death penalty procedures.

*Hurst* did nothing more than apply *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to Florida's death penalty procedure; it made no new law relevant to Nevada. *See Ex parte Bohannon*, 222 So. 3d 525, 532 (Ala. 2016) (discussing *Hurst*), *cert. denied sub nom. Bohannon v. Alabama*, 137 S. Ct. 831 (2017). Jeremias' interpretation of *Hurst* is apparently based on the Court's description of Florida's scheme, which it criticized on the grounds that "[t]he trial court *alone* must find 'the facts . . . [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances.'" *Hurst*, 577 U.S. at ___, 136 S. Ct. at 622 (second and third alterations in original) (quoting Fla. Stat. Ann. § 921.141(3) (West 2015)). Although that sentence appears to characterize the weighing determination as a "fact," the Court was quoting the Florida

SUPREME COURT
OF
NEVADA

(O) 1947A

19

statute, not pronouncing a new rule that the weighing of aggravating and mitigating circumstances is a factual determination subject to a beyond-a-reasonable-doubt standard. *Accord People v. Jones*, 398 P.3d 529, 554 (Cal. 2017); *Leonard v. State*, 73 N.E.3d 155, 169 (Ind. 2017); *Evans v. State*, 226 So. 3d 1, 39 (Miss. 2017). Were there any doubt on this point, it was eliminated roughly a week after *Hurst* when the Court announced *Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633 (2016). There, the Court made the same observations regarding the weighing process as this court had in *Nunnery*—that it was inherently a moral question which could not be reduced to a cold, hard factual determination. *Id.* at 642; *Nunnery*, 127 Nev. at 775, 263 P.3d at 252 ("[T]he weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum." (alteration in original) (quoting *Ex parte Waldrop*, 859 So. 2d 1181, 1189 (Ala. 2002))).

Moreover, while we have previously described the weighing process as a prerequisite of death eligibility, we recently reiterated that it is more accurately described as "part of the individualized consideration that is the hallmark of what the Supreme Court has referred to as the selection phase of the capital sentencing process—the '[c]onsideration of aggravating factors together with mitigating factors' to determine 'what penalty shall be imposed.'" *Lisle v. State*, 131 Nev., Adv. Op. 39, 351 P.3d 725, 732 (2015) (alteration in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 343 (1992)). We explained that a defendant is death-eligible, as the term is used for the purposes of the narrowing requirement amenable to the beyond-a-reasonable-doubt standard, so long as the jury finds the elements of first-degree murder and the existence of one or more aggravating

circumstances. *Id.* Once the State has proven first-degree murder and one statutorily defined aggravating circumstance beyond a reasonable doubt, each juror is tasked with determining whether to impose a death sentence. *Id.* While Nevada law provides that the jury may *not* impose a death sentence if the mitigating circumstances outweigh the aggravating circumstances, NRS 175.554(3) ("The jury may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found."), this does not transform the weighing component into a factual determination. Even if it did, we agree with the Court that it would be pointless to instruct that the jury must, or even that it could, make that determination beyond a reasonable doubt. *Carr*, 577 U.S. at ___, 136 S. Ct. at 642. We thereby reject the argument that the instruction in this case was unconstitutional.

*Nevada's death penalty scheme*

Jeremias argues that Nevada's death penalty scheme is unconstitutional on three grounds. First, he argues that it does not adequately narrow the class of persons eligible for the death penalty. Other than making speculative inferences from old statistics, he provides no citation, authority, or analysis of the issue, including no discussion of the aggravating circumstances outlined in NRS 200.033. This court has previously rejected generalized assertions that the death penalty is unconstitutional, *see Rhyne v. State*, 118 Nev. 1, 14, 38 P.3d 163, 172 (2002), and we do so here. Second, he argues that the death penalty constitutes cruel and unusual punishment. His argument is not supported by any cogent argument or authority, and we decline to consider it. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987). Third, he argues that executive clemency does not exist. Clemency is not required to make a

 

death penalty scheme constitutional. *Niergarth v. State*, 105 Nev. 26, 28, 768 P.2d 882, 883 (1989). Regardless, clemency is available through the pardons board. *Colwell v. State*, 112 Nev. 807, 812, 919 P.2d 403, 406-07 (1996).

*Cumulative error*

Jeremias asserts that cumulative error deprived him of due process. *See Valdez v. State*, 124 Nev. 1172, 1195, 196 P.3d 465, 481 (2008) (discussing cumulative error). We conclude that he fails to meet his burden of demonstrating that he is entitled to relief. Although we have identified several arguable errors, they occurred at different portions of the proceedings (jury selection, the guilt phase, and the penalty phase). Jeremias offers no explanation as to whether, or how, this court should cumulate errors across different phases of a criminal trial. Nor does he explain whether, or how, this court should cumulate errors he forfeited with errors he preserved. *See, e.g., United States v. Barrett*, 496 F.3d 1079, 1121 n.20 (10th Cir. 2007) (recognizing a split in authority as to cumulative error analysis when plain errors are implicated and declining to resolve "how to, if at all, incorporate into the cumulative error analysis plain errors that do not, standing alone, necessitate reversal"). Jeremias simply asserts that he incorporates all of the claims and that reversal is warranted. This is insufficient, and we reject the claim.

*Mandatory review of Jeremias' death sentences*

NRS 177.055(2) requires this court to determine whether the evidence supports the aggravating circumstances, whether the verdict of death was imposed under the influence of passion, prejudice, or any arbitrary factor, and whether the death sentence is excessive considering this defendant and the crime.

 


The jury found three aggravating circumstances regarding each murder: (1) the murder was committed in the course of a robbery, (2) the murder was committed to prevent a lawful arrest, and (3) the defendant was convicted of more than one murder in the proceeding. The first aggravating circumstance is supported by the evidence in that the victims' property was taken, Zapata testified that there was a plan to commit robbery, and Jeremias admitted that he took the victims' property. The second aggravating circumstance is also supported by the evidence: there was no reason to kill the victims other than to prevent them from reporting the robbery; further, Zapata testified that Jeremias said he did not need to wear a mask because the victims would know who he was, which suggests he killed them to avoid identification and thus arrest. The third aggravating circumstance is supported by the verdict itself. We conclude that the evidence supports the finding of the aggravating circumstances.

We also conclude that the death sentences are not excessive, nor were they imposed under the influence of passion, prejudice, or any arbitrary factor. Although we reiterate our concern with the prosecutor's comments during the penalty phase, we do not believe they improperly influenced the verdict in light of the totality of the circumstances. We recognize that Jeremias was relatively young at the time of the crime. And although the jury found as a mitigating circumstance that he was under the influence of a controlled substance during the murders, there is no evidence that he committed them because of his youth or because he was intoxicated; that he acted based on uncontrollable, irrational, or delusional impulses; or that the murders occurred during an emotionally charged confrontation. Instead, the evidence reflects advance planning and cold, deliberate calculation. Jeremias killed two people he claimed were his friends for a

SUPREME COURT
OF
NEVADA

(O) 1947A

23

small amount of money, some marijuana, and laptop computers. He apparently knew going into the apartment that he would kill the victims. Shortly after the murders, Jeremias went out celebrating, apparently unaffected by the acts he had just committed. Putting all of this together, we conclude that the death sentences are supported by our review of the record pursuant to NRS 177.055(2).

We therefore affirm.

_____, J.
Stiglich

We concur:

_____, C.J.
Douglas

_____, J.
Cherry

_____, J.
Gibbons

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre