139 Nev., Advance Opinion 38

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF D.M.F., A PROTECTED MINOR. | No. 84274 |

D.M.F.,
Appellant,
vs.
YALONDA F.; ALEXIS M.; AND
ANTONIO B.,
Respondents.

FILED

SEP 28 2023

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from a district court order removing a minor's guardian and terminating the guardianship. Eighth Judicial District Court, Family Division, Clark County; Denise L. Gentile, Judge.

*Reversed and remanded with instructions.*

Legal Aid Center of Southern Nevada, Inc., and Marina F. Dalia-Hunt and Kerri J. Maxey, Las Vegas,
for Appellant.

Alexis M., North Las Vegas,
Pro Se.

Antonio B., North Las Vegas,
Pro Se.

Yalonda F., North Las Vegas,
Pro Se.

BEFORE THE SUPREME COURT, EN BANC.

23-31813

## OPINION

By the Court, CADISH, J.:

In this appeal, we consider whether a district court's sua sponte decision to remove a protected minor's guardian and terminate that protected minor's guardianship based on an ex parte communication was within the court's power. We also consider whether the court's actions violated procedural due process protections and whether the court abused its discretion by failing to comply with the pertinent statutory requirements related to guardianship proceedings. Further, we consider whether the district court exceeded its authority in directing Child Protective Services (CPS) to take certain actions regarding the placement of the protected minor.

Regarding the district court's authority to sua sponte remove a guardian and terminate a guardianship, we conclude that the district court has such authority even in the absence of a petition seeking removal and termination. As to the due process question, we conclude the proceedings and resultant order did not comport with due process, as the court did not give proper notice that it was contemplating removal and termination such that the parties had a meaningful opportunity to be heard on the issue. We further conclude the district court abused its discretion by failing to apply the applicable statutes and factors for removal and termination, and it also made unsupported and clearly erroneous factual determinations in reaching its decision. Finally, we hold that while portions of the district court order stated what CPS should do going forward, its ultimate order in this regard was simply to refer the matter to CPS for "action as they deem fit," which is not an abuse of discretion. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

*Investigations into the protected minor's safety*

At birth, D.M.F. and A.F., his twin, tested positive for opiates and amphetamines. Respondent Alexis M., the mother, and respondent Antonio B., the father, admitted to methamphetamine use during the pregnancy. As a result, CPS began an investigation into possible abuse or neglect. The parents then agreed to allow respondent Yalonda F., the twins' paternal grandmother, to serve as a temporary guardian via a notarized temporary-guardianship appointment while the parents sought treatment.

As noted in the CPS records, Yalonda allowed the parents to stay at her home; however, if the parents' drug-use treatment ceased or they relapsed, Yalonda promised both to make them move out and to seek a court-ordered general legal guardianship over the twins. CPS noted that Yalonda provided for the twins' needs and that Yalonda had been assessed "appropriate and aligned with the twins." Ultimately, CPS permitted the hospital to release the twins to Yalonda.

A CPS specialist discussed with Yalonda and the parents the expectations for the newborns' care, including that the parents could support Yalonda in the care of the twins, but they could not sleep in the same room as the twins. Yalonda confirmed that she had placed the twins' bassinets in her room. In subsequent follow-ups, CPS observed that the twins appeared in "good physical health with no obvious signs of abuse or neglect." While CPS observed that the parents helped Yalonda care for the twins, it was noted that Yalonda was the primary caregiver and managed mainly on her own. Yalonda also described herself as very strict regarding the parents' drug treatment, and CPS confirmed that both parents had been participating in drug treatment services.

SUPREME COURT
OF
NEVADA

(O) 1947A

Before CPS closed its investigation, A.F. died in a co-sleeping incident with the parents. Police and CPS investigated the death. The investigations revealed that the twins, three months old at that time, had been fussy, prompting Antonio to help Yalonda care for them by taking A.F. to another room to calm him. Meanwhile, Yalonda calmed D.M.F. and put him to sleep in the bassinet in her room, at which time she also fell asleep. Antonio placed A.F. to sleep on a pillow in the bed he shared with Alexis. Eventually, Antonio and Alexis fell asleep with A.F. on the bed. When Antonio woke up in the morning, he found A.F. face down on the pillow and unresponsive. Yalonda unsuccessfully attempted to resuscitate A.F.

As part of the investigations, CPS documented that D.M.F. appeared healthy and showed no obvious signs of abuse or neglect. Yalonda also told CPS that the parents had, up to that point, followed her rules prohibiting the parents from sleeping with the twins in their room. Ultimately, police reported no concerns of abuse or neglect related to A.F.'s death and described A.F., based on physical observations, as a well-cared-for baby. The coroner ruled the cause of death positional asphyxia due to co-sleeping. The investigations ultimately concluded that A.F.'s death did not result from abuse or neglect. Accordingly, no charges were brought.

However, the CPS investigation also revealed that Alexis and Antonio had relapsed with methamphetamine. CPS described that the testing, which was done the day after A.F. died, appeared to confirm Alexis's statement of a one-time relapse; however, the testing also appeared to show that Antonio had used more than one time. When Yalonda learned of the relapse, she expressed her plan to seek general legal guardianship over D.M.F.

SUPREME COURT
OF
NEVADA

(O) 1947A

4

CPS reported that Yalonda exhibited adequate caregiver skills and met D.M.F.'s basic needs. While CPS found reasonable cause to believe that the parents presented a physical risk to D.M.F. because of the drug relapse and the incident of co-sleeping with A.F., two specialists ultimately deemed D.M.F. safe in Yalonda's care, closed the investigation, and issued final approval of Yalonda as caregiver for D.M.F.

*Petition for appointment of guardianship*

About one month after A.F.'s death, Yalonda petitioned the district court for appointment of guardianship over D.M.F.[1] D.M.F. was a little over four months old at that time. In the petition, Yalonda indicated that she had been D.M.F.'s temporary guardian since his birth because of the parents' drug use. She noted the agreement between her and the parents for her to serve as D.M.F.'s temporary guardian after he had been born substance exposed. She further stated, "Our agreement was that if they relapsed I would file for legal guardianship." She explained in the petition that both parents were unable to presently care for D.M.F. because they were active drug users.

Notarized consents from the parents and documentation of the temporary guardianship were attached to the petition for legal guardianship. The petition listed the same address for Yalonda, D.M.F., and the parents. Finally, Yalonda checked a box indicating that the

---

[1]Although the CPS case was officially closed after Yalonda petitioned the court for appointment as legal guardian, the records indicate that the investigation was concluded before Yalonda sought legal guardianship. The initial assessment report concluding that D.M.F. was safe in Yalonda's care was also pending final approval by a supervisor in early March before Yalonda sought legal guardianship. The records note that she asked CPS for advice on how to obtain guardianship and kept CPS updated on her efforts to do so.

SUPREME COURT
OF
NEVADA

(O) 1947A

5

guardianship was "NOT requested because of an investigation of abuse or neglect conducted by . . . [CPS] or law enforcement." Following a short hearing, the district court granted the petition and appointed Yalonda as guardian. D.M.F., who was represented by counsel at the hearing, did not object to the guardianship.

*Receipt of ex parte communication*

Six months later, the district court issued an order stating that it had reviewed, under the Nevada Statewide Rules for Guardianship (NSRG), an ex parte communication from another judge suggesting that there were possible misrepresentations made in Yalonda's petition.[2] Citing NSRG 5 and NRS 159.046,[3] the district court appointed a guardianship-compliance investigator, set a hearing on the ex parte communication, and ordered a response from Yalonda concerning the communication, including the failure to inform the district court of A.F.'s death and CPS's subsequent investigation thereof.

With respect to the guardianship-compliance investigator, the district court directed the investigator to examine D.M.F.'s placement, health, welfare, education, and financial status. The court also instructed the investigator to determine Yalonda's suitability as guardian and to explore her failure to inform the court of A.F.'s death or CPS's ensuing

---

[2]The other judge obtained information about A.F.'s death from CPS records in an unrelated matter regarding D.M.F.'s half-sibling, who was in the care of a different paternal grandmother, nonparty Jane Morales.

[3]Although the district court cited NRS 159.046, that provision applies to adult guardianships. Authority to appoint an investigator in minor guardianships is set forth in NRS 159A.046. Additionally, NSRG 5, which governs appointing an investigator in response to ex parte communications, appears to contain a typographical error in cross-referencing NRS 159.146, rather than NRS 159A.046.

investigation. The district court further requested that the investigator determine who resided in the home, whether CPS had any open investigations concerning D.M.F., and whether any unsupervised contact between the parents and D.M.F. occurred.

*Guardianship-compliance investigator's report*

The investigator filed a report with the district court. Even though the district court had tasked the investigator with determining Yalonda's suitability and D.M.F.'s status, the report did not contain any conclusions in that regard. The investigator noted the existence of established sleeping arrangements for the children at the time of A.F.'s death but did not describe those arrangements. There was no indication in the investigator's report that Yalonda or the parents had previously co-slept with the twins.

The report provided that Yalonda had informed the investigator that D.M.F. was safe, immunized, treated by a cardiologist for a heart murmur, and enrolled in early intervention services. Yalonda also told the investigator that she did not permit the parents to have unsupervised contact with D.M.F. and established back-up care for D.M.F. if she needed someone to watch him. She stated that both parents were sober again. The report did not reveal any effort to independently verify the information provided by Yalonda.

As to Yalonda's failure to inform the court of A.F.'s death and the ensuing investigation, the investigator stated that Yalonda had worked with a nonprofit organization to finish the guardianship paperwork, which had told her to submit the paperwork as completed. Additionally, the investigator noted that Yalonda did not believe she needed to inform the court of A.F.'s passing because, so she thought, the CPS investigation had been closed.

 

*Hearing on the ex parte communication*

At the hearing to address the ex parte communication regarding A.F.'s death, the district court questioned Yalonda's judgment as a caregiver and expressed concern for D.M.F.'s safety, because Yalonda's "decision . . . put [A.F.] in the position that he was in, in the first place," despite that the "parents were on drugs and the children were born . . . with drugs in their system." The district court then discussed, hypothetically, the options that were available in the event it deemed Yalonda an inappropriate guardian, including allowing CPS to make a placement determination. The court observed that "grandma can get the guardianship through [an NRS Chapter 432B] case," if CPS deems a guardianship appropriate, and purported to "just really weigh[ ] what this [c]ourt should do in terms of . . . whether this person is an appropriate person." Despite stating that no "disqualifying factors" existed, the district court nevertheless listed what it viewed as concerning issues regarding Yalonda's suitability as guardian: (1) allowing the parents to remain in the home, (2) deciding to leave a child with "those people who were obviously very careless," and (3) permitting the parents continued access to D.M.F. The district court acknowledged that Yalonda was not allowing the parents to watch D.M.F. without supervision, but the court questioned its ability to prevent unsupervised contact between the parents and D.M.F.

D.M.F.'s counsel argued "[D.M.F.] deserves somebody who's gonna take care of him, somebody who's gonna provide him with the basic necessities and keep him safe . . . . And that is what Ms. [Yalonda] is doing. And that's what our statutes concentrate on." D.M.F.'s attorney proposed that the court order quarterly, rather than yearly, reports from Yalonda, require the parents to leave the home, or preclude the parents from unsupervised contact. Moreover, D.M.F.'s attorney suggested that the court

Supreme Court
of
Nevada

(O) 1947A

8

could refer the matter to CPS but that CPS would likely abide by its decision. Lastly, D.M.F.'s counsel argued that Yalonda's failure to inform the court of A.F.'s death was not intentional.

At the hearing, Yalonda asserted that "everything is . . . about keeping [D.M.F.] safe." She noted that she never missed D.M.F.'s doctor appointments, kept him clean, and put him to sleep in a pack-and-play in her room. Yalonda also stated that she never left him alone with the parents and had back-up care if necessary, and she volunteered to make the parents leave her home. She mentioned that Alexis was sober and employed at Amazon, which tested for drugs. She also told the court that she did not intentionally omit A.F.'s death or the investigation, explaining that she had sent a copy of the guardianship petition to a nonprofit organization, who reviewed it for her and noted no concerns.

The district court stated that it believed the omission was unintentional. The court also remarked that Yalonda "had no ill intentions" and that she was "overly protective of this one." However, the district court expressed concerns regarding D.M.F.'s environment because the parents continued to live there. The court considered whether it could order that the parents no longer live with Yalonda, as it concluded that the parents are the issue. Yet the court indicated that it was reluctant to do so without an independent person in the home who could monitor the family on a day-to-day basis. Ultimately, the court stated that it would either set another hearing or issue an order. The district court barred the parents from any unsupervised contact with D.M.F. in the interim.

*Removal of the guardian and termination of the guardianship*

Thereafter, the district court entered an order removing Yalonda as guardian and terminating D.M.F.'s guardianship. The order cited only NSRG 5 as authority. The district court found that Yalonda had

Supreme Court
of
Nevada

(O) 1947A

9

failed to reveal prior history with the parents of the children, citing three incidents in the CPS records that occurred before D.M.F.'s birth.

The district court then discussed the CPS investigations into the parents' drug use and A.F.'s death. Noting that the investigations were ultimately closed, the district court found that "this guardianship was granted under false pretenses" based on the following:

> [T]he Petition for Appointment was filed just shortly after the twin died in the care of grandmother, and she chose not to reveal this information, and unilaterally deemed that this information was not necessary. . . . At the hearing on this matter, . . . this [c]ourt queried [Yalonda] for the reason to conceal this information. She indicated that she did not intentionally conceal the information, but yet, this tragedy happened only days prior to the filing of the petition.

Further, the court expressed that Yalonda's

> judgment relating to her responsibility to care for the child is not adequate, given that she was handed the twin children by CPS after an investigation of the parents, and within a few days, one of the twins was deceased due to her choice to allow the parents to care for the child because both of them were fussy.

The district court acknowledged that Yalonda was willing to require the parents move out to maintain the guardianship over D.M.F., but it claimed that it was unable to have the oversight necessary to prevent any continued exposure to the parents.

Thus, the district court found removal of Yalonda as guardian in D.M.F.'s best interests and referred the matter to CPS for further investigation. The court reasoned that this was necessary based upon

> the lack of judgment displayed when the children were placed in the care of the paternal

SUPREME COURT
OF
NEVADA

(O) 1947A

10

grandmother by CPS, the lack of candor to the [c]ourt of the surrounding circumstances and the death of [D.M.F.'s] twin brother, the fact that the troubled parents remain in the household with [Yalonda and D.M.F.], and said fact was concealed from this court, that the parents were found to have been under the influence of methamphetamine at the time they were in charge of their child who died and this fact was concealed from the [c]ourt, [and] the need for this family to have oversight by Department of Family Services.

In discussing the referral to CPS, the court stated it "FINDS" that even if CPS assessed Yalonda as an appropriate caregiver of D.M.F., "a case should be opened with [the] Juvenile Court, so that placement can be made through the Juvenile Court" and "the family can obtain the resources available to them through that process." In the end, however, the court simply ordered "that this matter shall be referred to Child Protective Services again for further investigation and action as they deem fit." D.M.F. appeals.

## DISCUSSION

### Standard of review

We do not disturb a guardianship determination absent an abuse of discretion. *Jason S. v. Valley Hosp. Med. Ctr. (In re Guardianship of L.S. & H.S.)*, 120 Nev. 157, 163, 87 P.3d 521, 525 (2004). An abuse of discretion occurs where the district court fails to supply appropriate reasons to support the determination, *see id.*, "exceeds the bounds of law or reason," or makes an "arbitrary or capricious" decision, *State v. Eric A.L. (In re Eric A.L.)*, 123 Nev. 26, 33, 153 P.3d 32, 36-37 (2007). And the district court also abuses its discretion when it "bases its decision on a clearly erroneous factual determination" or "disregards controlling law." *MB Am., Inc. v. Alaska Pac. Leasing Co.*, 132 Nev. 78, 88, 367 P.3d 1286, 1292 (2016).

However, questions of law within a guardianship determination are reviewed de novo. *See Tahja L. v. State, Dep't of Family Servs. (In re Parental Rights as to L.L.S.)*, 137 Nev. 241, 245, 487 P.3d 791, 796 (2021) (reviewing "constitutional issues such as a parent's right to due process in a termination proceeding de novo"); *Potter v. Potter*, 121 Nev. 613, 616, 119 P.3d 1246, 1248 (2005) (reviewing questions of statutory interpretation de novo).

*The district court has authority to remove a guardian and terminate a guardianship, even absent a petition*

D.M.F. contends that even though NSRG 5 gives the district court "numerous options" to respond to an ex parte communication, it does not "empower[ ]" the court "to unilaterally remove a guardian." D.M.F. further argues that the absence of the district court as a party who may petition for the removal of a guardian under NRS 159A.1853 means that the provision "does not include the district court, especially on a sua sponte basis." D.M.F. thus contends that the district court lacked any power to act because no petition for removal had been filed. Similarly, he asserts that no provision allows a court to sua sponte terminate a guardianship.[4]

This court recently held, in the context of an adult guardianship proceeding under NRS Chapter 159, that "separate from an individual formally petitioning the court, the district court has its own ability to remove a guardian if it determines that one or more of the conditions set forth in NRS 159.185 have been satisfied." *Jones v. Friedman (In re Guardianship of Jones)*, 139 Nev., Adv. Op. 17, at 4, 531 P.3d 1236. 1243

---

[4]Respondents, who are all pro se and who were in favor of the guardianship during the district court proceedings, did not file answering briefs.

SUPREME COURT
OF
NEVADA

(O) 1947A

(2023). NRS Chapter 159A governs guardianship proceedings concerning minors, including the instant case, and NRS 159A.185 contains provisions analogous to those we relied on in *Jones*. Specifically, NRS 159A.185(1) outlines conditions for removal of a guardian and states that the district court "may remove a guardian if the court determines" one or more of those conditions exists. Looking to our prior caselaw and that of other states, we held in *Jones* that while various statutory provisions contemplate the filing of a petition for removal of a guardian by a party, "inherent in the district court's jurisdiction over the guardianship is the power to appoint and remove guardians." *Id.* at 1242-43. We see no reason to hold differently in a minor guardianship proceeding and thus conclude that the district court has the authority to sua sponte remove a minor's guardian if one or more of the conditions set forth in NRS 159A.185 is satisfied and all other applicable requirements are met.[5]

*The district court denied D.M.F. due process of law when it removed D.M.F.'s guardian and terminated the guardianship after the NSRG 5 hearing*

D.M.F. argues that the district court violated his due process rights and abused its discretion, as he and other interested persons did not

---

[5]We note also that under NSRG 5(A), "[i]n order to carry out the court's oversight and enforcement of compliance in guardianship proceedings," the court may receive and review ex parte communications ordinarily prohibited by the Nevada Code of Judicial Conduct, "if such communications raise a significant concern about a guardian's compliance with his or her statutory duties and responsibilities, or the protected person's welfare." In response to such communications, the court may take numerous steps, including taking any action supported by the record, notifying any appropriate government agency, appointing an investigator (as it is authorized to do "at any time" under NRS 159A.046(1)), and setting a hearing. NSRG 5(B). It would be anomalous to allow the court to receive and follow up on such communications if the court were powerless to thereafter act to protect the welfare of the protected person.

receive notice regarding the prospect of removal or termination, and the district court did not hold a hearing regarding the same. D.M.F. contends that the NSRG 5 order failed to indicate that the district court was considering removal and termination, particularly where "no one requested that Yalonda be removed as guardian or the guardianship terminated." We agree.

The district court's actions implicate D.M.F.'s procedural due process rights to notice and a meaningful opportunity to be heard. *See Callie v. Bowling*, 123 Nev. 181, 183, 160 P.3d 878, 879 (2007); *see also* NRS 159A.1855(1) (requiring the court to issue and petitioner to serve a citation on the guardian and all interested parties when a petition to remove the guardian has been filed). Both the United States Constitution and the Nevada Constitution provide that no person shall be deprived of a protected life, liberty, or property interest without due process of law. U.S. Const. amend. XIV, § 1; Nev. Const. art. 1, § 8(2).

The district court's decision here affects several protected interests. This court has held when a court sua sponte removes a guardian, without the formal filing of a petition, the court "[risks] depriv[ing] a protected person of their autonomy and imping[ing] on the protected person's rights." *Jones*, 139 Nev., Adv. Op. 17, at 12, 531 P.3d at 1243. Other courts have concluded that a minor possesses a constitutionally protected liberty interest in "familial companionship." *See, e.g., Smith v. City of Fontana*, 818 F.2d 1411, 1414, 1417-18 (9th Cir. 1987) (recognizing a child's "interest in the continued companionship" of a parent in the context of a 42 U.S.C. § 1983 claim). The premature termination of the guardianship may also jeopardize D.M.F.'s relationship with his parents, who consented to the guardianship and still retain parental rights in the

Supreme Court
OF
Nevada

(O) 1947A

14

upbringing of their child. *See Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982) ("[A] natural parent's 'desire for and right to the companionship, care, custody, and management of his or her children' is an interest far more precious than any property right." (quoting *Lassiter v. Dep't of Soc. Servs. of Durham Cty.*, 452 U.S. 18, 27 (1981))).

Moreover, the relationship between D.M.F. and his guardian, who is also his grandmother, fits into the protected parent-child paradigm because Yalonda has served as his primary caretaker since birth. *See Rivera v. Marcus*, 696 F.2d 1016, 1025 (2d Cir. 1982) (concluding that "custodial relatives" enjoy "due process protections when the state decides to remove a dependent relative from the family environment"). And finally, the district court's decision bears on the protection Yalonda affords to D.M.F. Indeed, a guardian has a liberty interest in the care, custody, and management of a child under their protection akin to, but not entirely coextensive with, the rights of a parent. *See, e.g., Simuro v. Shedd*, 176 F. Supp. 3d 358, 384 (D. Vt. 2016) ("[P]arents and guardians of minor children have protected interests in the care, control, and custody of those children."). Thus, due process requires D.M.F., and those others holding protected interests, be afforded notice and an opportunity to be heard with respect to the removal of his guardian and termination of the guardianship.[6]

"The fundamental requisite of due process is the opportunity to be heard." *Browning v. Dixon*, 114 Nev. 213, 217, 954 P.2d 741, 743 (1998) (citing *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)). "This right has little

---

[6]We note that while D.M.F.'s due process rights are at issue in this appeal, Yalonda and D.M.F.'s parents' due process rights are also impacted by the district court's decision, as they all have liberty interests in the guardianship and care of D.M.F.

reality or worth unless one is informed that the matter is pending and can choose for [themself] whether to appear or default, acquiesce or contest." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1949). Notice is sufficient to satisfy due process where it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.*; *compare Jones*, 139 Nev., Adv. Op. 17, at 13-14, 531 P.3d at 1244 (concluding that various requests for removal, both oral and written, sufficiently put a protected person on notice of the potential removal of their guardian despite no formal petition being filed), *with Micone v. Micone*, 132 Nev. 156, 159, 368 P.3d 1195, 1197 (2016) (holding that the district court's sua sponte award of physical custody to nonparty paternal grandparents violated parents' right to due process because the parties' briefs and arguments concerned which parent should have custody and did not address the paternal grandparents). Generally, notice must be given before a party's substantive rights are affected. *See Wiese v. Granata,* 110 Nev. 1410, 1412, 887 P.2d 744, 745-46 (1994) (concluding notice of a hearing that failed to mention or even hint at child custody as a subject of the hearing violated the appellant's due process rights when custody was changed as a result of the hearing).

D.M.F. proposes that the district court should have issued a citation to the guardian and any other interested person to show cause why the district court should not remove the guardian or terminate the guardianship, as required by NRS 159A.1855 and NRS 159A.1905 when a petition for removal or termination has been filed. *See* NRS 159A.1855(1) (requiring a citation to issue regarding a petition for removal of a guardian); NRS 159A.1905(4) (providing the same as to a petition for termination of a

SUPREME COURT
OF
NEVADA

(O) 1947A

16

guardianship). Had the district court issued such citations, D.M.F. and all other interested parties, namely Yalonda and D.M.F.'s parents, would have been apprised of the possibility of removal of Yalonda as D.M.F.'s guardian and termination of the guardianship. However, no such citations were issued; thus we turn to the other actions of the district court to determine whether sufficient notice was provided.

We conclude that the notice provided by the district court was inadequate and did not afford D.M.F. due process of law. First, none of the district court's orders provided a clear indication that removal and termination would be at issue at the hearing or in the court's subsequent order. For example, the NSRG 5 order set a hearing on the issues raised by the ex parte communication, which were identified as misrepresentations made to the district court regarding D.M.F. and the adequacy of the petition to appoint a guardian, given Yalonda's failure to inform of A.F.'s death and CPS's investigation. Nothing within the order indicated that the significant actions of removal and termination were on the table; instead the order indicated an investigator would be appointed and a hearing would be held where Yalonda could respond regarding the issues raised.

Likewise, a second order, issued simultaneously with the first, appointed an investigator to prepare a report on Yalonda's suitability and her omission to the court, as well as on D.M.F.'s health and welfare. Although the order raised concerns regarding the guardian's suitability and the protected minor's welfare, it did not indicate the potential for the drastic step of removal and termination, such as directions to investigate potential substitute guardians or the necessity for the guardianship. Had the order unambiguously notified the interested parties of the prospect of removal and termination, as a citation would have, then those interested parties

Supreme Court
OF
Nevada

(O) 1947A

17

could have meaningfully addressed these issues. By failing to clearly notify the parties of the significance of the interests at stake, the district court's notice failed "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314.

Furthermore, even if D.M.F. received notice that guardianship was to be determined at the hearing on the ex-parte communication, the hearing D.M.F. actually received cannot be construed as having provided D.M.F. with due process of law. In the context of child custody cases, even when proper notice is provided, this court has held that "litigants . . . have the right to a full and fair hearing concerning the ultimate disposition of a child." *Moser v. Moser*, 108 Nev. 572, 576, 836 P.2d 63, 66 (1992). A full and fair hearing requires that the change in custody be supported by factual evidence and the party threatened with the loss of parental rights must be given the opportunity to rebut the evidence presented against them. *Id.* at 577, 836 P.2d at 66.

This court's opinion in *Wiese v. Granata* illustrates the requirements of a full and fair hearing regarding custody issues. 110 Nev. 1410, 887 P.2d 744 (1994). There, the father had full custody of the parties' child. *Id.* at 1410, 887 P.2d at 745. The mother obtained a temporary protective order against the father and sought to extend the order. *Id.* at 1411, 887 P.2d at 745. The father was served with the motion, an order to show cause, and the notice of hearing, wherein the mother sought modification of her visitation. *Id.* The notice indicated the district court would consider whether to extend, modify, or dissolve the temporary protective order and whether the father had violated the terms thereof. *Id.* The father did not appear at the hearing to extend the temporary protective

order upon the advice of counsel, and the district court subsequently entered an order granting the mother physical custody of the child. *Id.* In response, the father filed an emergency motion to stay the order granting the mother physical custody and requested a hearing. *Id.* The hearing on the emergency motion to stay was limited to 30 minutes, and the mother did not present any evidence concerning custody. *Id.* at 1411-13, 887 P.2d at 745-46. The district court denied the father's request and affirmed its order granting the mother custody. *Id.* at 1411, 887 P.2d at 745. On appeal, this court concluded the notice was inadequate because nothing in the notice or the order to show cause could be fairly read as notice that custody determinations were to be made at this hearing. *Id.* at 1411-12, 887 P.2d at 745-46. Furthermore, this court held that even had the notice been sufficient, the hearing on the emergency motion to stay could not be construed as a full and fair hearing on the change of custody because the mother did not present any evidence supporting the change in custody and therefore the father was not given a meaningful opportunity to respond without being provided the information on which the district court relied. *Id.* at 1412-13, 887 P.2d at 745-46.

Here, the investigator filed a report that provided no recommendations or conclusions regarding Yalonda's suitability or D.M.F.'s health and welfare, thus giving no indication of the case (i.e., the facts and arguments) regarding the need to remove Yalonda as guardian and terminate D.M.F.'s guardianship. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (noting that due process requires "notice of the case against [a person] and opportunity to meet it" (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring))). Because the report lacked specificity regarding the type of

SUPREME COURT
OF
NEVADA

(O) 1947A

19

evidence amassed against the guardian and the guardianship, yet the district court relied on it, D.M.F. and Yalonda lacked the ability to adequately address these concerns at the hearing.

Furthermore, the district court held a hearing during which no testimony under oath was presented or considered. Moreover, because no party petitioned for Yalonda's removal or termination of the guardianship and the court did not clearly indicate it was sua sponte considering doing so, it was unclear that such serious actions were under consideration. The district court was also unclear throughout the hearing as to the purpose of the hearing and the actions that it intended to take. Because of the lack of clarity regarding the purpose of the hearing, the parties could not appropriately address the issues of removal and termination. As a consequence, they were not given a meaningful opportunity to be heard on the issues. *See Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))).

Thus, we conclude that the notice provided to D.M.F. in this case was inadequate because it did not fairly apprise him that Yalonda's removal as guardian was being considered or that the guardianship was at risk of termination during the hearing. Furthermore, D.M.F. did not receive a full and fair hearing because D.M.F. was not presented with the case for such actions and thus did not have a meaningful opportunity to be heard on the issues.

While the procedural due process violation requires reversal, D.M.F. also contends that the district court abused its discretion in its application of controlling law governing removal of guardians and

SUPREME COURT
OF
NEVADA

(O) 1947A

termination of guardianships and exceeded its authority in referring the matter to CPS. Because these issues may persist on remand, we address them here.

*The district court abused its discretion in removing Yalonda as guardian and terminating D.M.F.'s guardianship, but did not abuse its discretion in referring the matter to CPS*

D.M.F. argues that the district court failed to apply clearly controlling Nevada law that governs the removal and termination of guardianships. As removal and termination involve separate inquiries, we discuss each in turn below.

*Removal of Yalonda as guardian*

D.M.F. argues that the district court's removal determination constituted an abuse of discretion because it did not consider whether Yalonda met any of the conditions for removal beyond a conclusory reference to D.M.F.'s "best interest" and relied on incorrect findings regarding Yalonda's perceived dishonesty to the court and the parents' intoxication while caring for A.F. Moreover, D.M.F. contends that the district court reached its determination without applying the mandatory best-interest factors laid out in NRS 159A.186.

As noted, a district court may remove a guardian if it determines that one or more of several disqualifying factors exist, including the guardian's negligence in performing their duties, resulting in injury or a likelihood of injury to the protected minor. NRS 159A.185(1). Yet the existence of a condition of removal and the court's election to exercise its discretion regarding such condition do not end the matter. "Notwithstanding any other provision of law, . . . the court *shall not* remove the guardian or appoint another person as guardian unless the court finds that removal of the guardian or appointment of another person as guardian

SUPREME COURT
OF
NEVADA

(O) 1947A

is in the best interests of the protected minor." NRS 159A.186(1) (emphasis added); *see also* NRS 159A.186(2) (providing factors that the court must consider regarding the minor's best interests). The use of "shall" here makes the best-interests-of-the-child analysis mandatory. *See Nev. Pub. Emps. Ret. Bd. v. Smith*, 129 Nev. 618, 627, 310 P.3d 560, 566 (2013). Therefore, a finding that removal serves the best interests of the protected minor does not by itself provide a basis for or trigger removal; instead, it overcomes NRS 159A.186(1)'s functional presumption against removal. Reading the removal provisions in harmony, the district court must first determine whether one of the enumerated conditions for removal under NRS 159A.185(1) exists and, if so, conduct a best-interests-of-the-child analysis. Relatedly, while NSRG 5's language is broad enough to include possible removal of a guardian in response to an ex parte communication that raises a "significant concern" about the guardian's compliance with their duties or the protected minor's welfare, removal initiated under NSRG 5 still needs to satisfy one of the conditions under NRS 159A.185(1) and serve the best interests of the minor under NRS 159A.186(2).

Applying these principles here, the district court abused its discretion when it removed Yalonda as guardian. The district court cited no law other than NSRG 5, simply concluding that concerns remained about Yalonda's compliance with her duties and that removal was in the best interests of D.M.F. The court did not identify which of the enumerated conditions for removal under NRS 159A.185(1) it found or even acknowledge the need for such a finding, nor did it address the mandatory best-interest factors under NRS 159A.186(2). The district court justified removal based on its finding that Yalonda lied to the court to obtain the appointment. The district court also found that Yalonda had concealed "the

SUPREME COURT
OF
NEVADA

(O) 1947A

22

fact that the troubled parents remain in household." However, Yalonda's petition listed the same address for herself and the parents. The petition also clearly stated the parents were active drug users. The basis for the court's findings about Yalonda's purported lying and concealment seems to stem from its misunderstanding that the time frame of the pertinent events was more compressed than it actually was, finding that A.F.'s death "happened only days prior to the filing of the petition," when Yalonda petitioned the court a month after A.F.'s death. Similarly, the court erroneously stated that A.F.'s death happened within a few days after Yalonda obtained temporary guardianship, when Yalonda had been caring for D.M.F. and A.F. for three months without incident. The court also seems to disagree with the conclusions of the police and CPS that A.F.'s death was not the result of abuse or neglect but rather a tragic accident. While the court's initial concerns are understandable, the record lacks any evidentiary support for a different conclusion.

As the district court failed to apply the mandatory best-interest factors in NRS 159A.186(2), failed to find a predicate condition for removal under NRS 159A.185(1), and relied on unsupported and clearly erroneous factual determinations, we agree with D.M.F. that the district court abused its discretion in removing Yalonda as guardian.

*Termination of the guardianship*

D.M.F. contends that the district court abused its discretion in terminating his guardianship because it did not apply any of the provisions concerning the termination of a guardianship and failed to make explicit findings explaining how terminating the guardianship was in D.M.F.'s best interests. He also argues that the district court failed to follow NSRG 10 because it removed a sole guardian from a child who still needed a guardian

without either appointing a successor guardian or finding that D.M.F. no longer needed a guardian.

Under NSRG 10(A), "the court shall *not* terminate the guardianship . . . without making specific findings" regarding three things: (1) the protected minor's "current health and welfare," (2) the "reasons a guardianship does or does not remain necessary, including identifying the existence of less-restrictive alternatives," and (3) "[w]hether maintaining the guardianship would serve the protected person's best interests." The order here falls short of the NSRG 10 requirements. To the extent the district court's order considered D.M.F.'s current health or welfare, it focused on the supervised contact with "the troubled parents" and A.F.'s death. The order did not address how termination of the guardianship would improve or maintain his health and welfare, given that it would place him back in the care and custody of those parents. The district court also did not identify any reason why the guardianship no longer remains necessary. Further, it summarily dismissed less-restrictive alternatives as impossible to implement. And its best-interests analysis looked at only one factor out of many and relied on unsupported and clearly erroneous findings, as discussed above. For these reasons, the district court abused its discretion in failing to make specific, supportable findings regarding the NSRG 10 factors before it terminated D.M.F.'s guardianship.

*CPS referral*

As noted, D.M.F. argues that the district court exceeded its authority in attempting to direct CPS to remove D.M.F. from his parents' and Yalonda's care and to institute a dependency proceeding under NRS Chapter 432B. While CPS may determine whether grounds exist for an investigation into possible abuse or neglect, the district court may not mandate that CPS find the existence of a statutory circumstance that

SUPREME COURT
OF
NEVADA

(O) 1947A

warrants initiation of an investigation. Similarly, the district court does not possess the authority to direct CPS to open a case under NRS Chapter 432B regarding D.M.F.'s placement and make the placement through court order. But this did not occur here. While the district court did express its disagreement with CPS's actions and conclusions, finding that if CPS felt placement with Yalonda was appropriate then a case should be opened with the juvenile court and expressing concern that CPS had not previously proceeded with a dependency case, in the end it simply ordered the matter "referred to Child Protective Services again for further investigation and action as they deem fit." This order does not inappropriately direct the action CPS must take and does not constitute an abuse of discretion.

*CONCLUSION*

If it receives information causing concern regarding the propriety of a minor's guardianship, a district court may sua sponte initiate the process for removing a guardian and terminating a guardianship. In doing so, the court must protect the procedural due process rights of the protected minor, parents, and guardian by, at a minimum, giving notice of the contemplated action and holding a hearing on the prospect of removal and termination so that the parties have a meaningful opportunity to be heard. All the while, the court must adhere to the applicable statutes and rules under NRS Chapter 159A and the NSRG in determining whether removal of the guardian and termination of the guardianship are appropriate, making the required findings to support those decisions.

Here, the district court did not give notice to D.M.F., Yalonda, or D.M.F.'s parents regarding the prospect of removal or termination; nor did the court hold a hearing regarding the same. The court, therefore, violated the due process rights of D.M.F. and failed to comply with the statutory requirements for removal and termination, requiring reversal.

SUPREME COURT
OF
NEVADA

(O) 1947A

25

Accordingly, we reverse and remand with instructions to reinstate the guardianship and reappoint Yalonda, provided she is willing and able, as guardian. If the district court determines that it should proceed with a hearing to consider removal of the guardian or termination of the guardianship, it must provide notice to D.M.F., Yalonda, and the parents that expressly advises of these potential consequences and hold a full hearing on the same. Should the district court, after the hearing, conclude that removal or termination is appropriate, the court must make the necessary findings and address the mandatory factors set forth in the applicable statutes and rules.

_____, J.
Cadish

We concur:

_____, C.J.
Stiglich

_____, J.
Pickering

_____, J.
Herndon

_____, J.
Lee

_____, J.
Parraguirre

_____, J.
Bell

SUPREME COURT
OF
NEVADA


(O) 1947A